## UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICHAEL ANTHONY CARRETTA, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 1:25-cv-00096-JLH-EGT |
| | ) | |
| Plaintiff, | ) | <u>CLASS ACTION</u> |
| | ) | |
| vs. | ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |
| CROCS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION AND OVERVIEW ............................................................1

II.   JURISDICTION AND VENUE ..............................................................................3

III.  PARTIES ........................................................................................................3

IV.   SUBSTANTIVE ALLEGATIONS ..........................................................................4

    A.    Background ..............................................................................................4

    B.    Defendants' False and Misleading Statements .............................................6

        1.    Statements Relating to the Second Quarter of 2022 ...................................6

        2.    Statements Relating to the Third Quarter of 2022 ....................................11

        3.    Statements Made at the Morgan Stanley Global Consumer and Retail Conference..........................................................................................14

        4.    Statements Made at the ICR Conference ..................................................15

        5.    Statements Relating to the Fourth Quarter and Full Year 2022................16

    C.    While the Truth Begins to Emerge, Defendants Continue to Conceal the Full Extent and Ramifications of the "Pipeline Fill" .......................................20

        1.    Crocs' Earnings for the First Quarter of 2023 ..........................................20

        2.    The Robert W. Baird Global Consumer, Technology & Services Conference..........................................................................................21

        3.    Crocs' Earnings for the Second Quarter of 2023.......................................24

        4.    Williams Trading Cuts Its Price Target for Crocs Stock ..........................26

        5.    Crocs' Earnings for the Third Quarter of the 2023 ...................................27

    D.    The Truth Continues to Gradually Emerge as Defendants Attempt to Soften the Blow with False and Misleading Reassurances....................................29

        1.    Earnings for the Fourth Quarter and Full Year 2023 and February 15, 2024 Earnings Call ............................................................................29

        2.    April 16, 2024 Ratings Cut by Williams Trading......................................31

        3.    Earnings for the First Quarter of 2024......................................................32

**Page**

4.      Earnings for the Second Quarter of 2024 ...................................................33

E.      The Complete Truth About HEYDUDE's Inventory Problems Is Belatedly Revealed .........................................................................................34

V.      ADDITIONAL SCIENTER ALLEGATIONS....................................................................36

VI.     LEAD PLAINTIFFS' CLASS-ACTION ALLEGATIONS...............................................40

VII.    PRESUMPTION OF RELIANCE........................................................................................42

VIII.   NO SAFE HARBOR ............................................................................................................43

IX.     LOSS CAUSATION AND ECONOMIC LOSS .................................................................43

X.      CLAIMS AGAINST DEFENDANTS.................................................................................44

COUNT I   .............................................................................................................................................44

Violations of Section 10(b) of the Exchange Act and SEC  Rule 10b-5 Against All Defendants ........................................................................................................44

COUNT II  .............................................................................................................................................45

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ......................................................................................................................45

XI.     PRAYER FOR RELIEF .......................................................................................................46

XII.    DEMAND FOR JURY TRIAL ...........................................................................................47

Lead plaintiffs Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees ("Lead Plaintiffs"), by and through Lead Plaintiffs' counsel, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Lead Plaintiffs' counsel, which included, among other things, a review of public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases of Crocs, Inc. ("Crocs" or the "Company"), and industry and analyst reports about the Company and its senior executives.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired Crocs common stock between August 4, 2022, and October 28, 2024, inclusive (the "Class Period"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Crocs is a casual lifestyle footwear company.  In February 2022, Crocs completed its acquisition of HEYDUDE, a footwear company focusing on casual, comfortable, and lightweight footwear.  The Company reports HEYDUDE sales in two categories: direct-to-consumer ("DTC") sales (which include retail and e-commerce sales) and wholesale sales (which include sales to national and regional retail chains).  Although Crocs acquired HEYDUDE in mid-February 2022, HEYDUDE accounted for approximately 25% of the Company's total revenues that year.  Crocs told investors that HEYDUDE was a rapidly growing brand that would contribute to explosive revenue growth for the Company.

3.      However, the revenue Crocs recognized from HEYDUDE in 2022 consisted largely of shipments to wholesale customers in amounts far in excess of consumer demand. Defendants (defined below) knowingly engaged in these excess sales – a practice they later described as "pipeline filling," and which is commonly known as "channel stuffing" – in an effort to stave off competition from inexpensive knockoffs of HEYDUDE styles and to secure shelf space. This effort was self-defeating, because the excess sales in 2022 created bloated inventories at Crocs' wholesale customers, leading to reduced sales to wholesale customers and lower revenue growth for Crocs in 2023 and 2024 as those surplus inventories were gradually sold off.

4.      The truth began to emerge when Crocs announced its first quarter 2023 financial results in April 2023. The Company disclosed a sharp decline in HEYDUDE's revenue growth from that reported in 2022 and previously projected for 2023 and explained this decline as the result of "pipeline fill" at major wholesale customers – *i.e.*, Defendants' channel stuffing activities. However, Defendants falsely reassured investors throughout 2023 and most of 2024 that the Company was successfully addressing the wholesale customers' excess inventory and expected to resume robust HEYDUDE growth in the near future. The truth about the massive, persistent adverse impact on Crocs from Defendants' channel stuffing activities was fully revealed only when Defendants disclosed unexpectedly severe revenue declines at the end of the Class Period in October 2024.

5.      The series of partial disclosures in which Defendants understated the channel stuffing's impact caused a series of significant declines in Crocs' stock price, culminating in a final sharp drop at the end of the Class Period when the truth was fully revealed. Thus, Defendants' channel stuffing scheme and failure to disclose it fully and promptly caused large losses for investors in Crocs common stock.

## II.     JURISDICTION AND VENUE

6.      Lead Plaintiffs' claims in this action arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.[1]

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), because Crocs is incorporated in this District.

9.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

10.      As set forth in Lead Plaintiffs' accompanying certifications, which are incorporated by reference in this Complaint, Lead Plaintiffs purchased Crocs common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

11.      Defendant Crocs is a Delaware corporation headquartered at 500 Eldorado Blvd., Building 5, Broomfield, Colorado 80021.  Crocs' common stock trades on the Nasdaq Global Select Market under the ticker symbol "CROX."

12.      Defendant Andrew Rees ("Rees") is the Company's Chief Executive Officer and a Company Director.

---

[1]      In this Complaint, "including" means including without limitation.

13.     Defendant Anne Mehlman ("Mehlman") was the Company's Executive Vice President and Chief Financial Officer until June 3, 2024, and has been the Company's Executive Vice President and Crocs Brand President since May 3, 2024.

14.     Defendants Rees and Mehlman are collectively referred to in this Complaint as the "Individual Defendants."

15.     Crocs and the Individual Defendants are collectively referred to in this Complaint as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

16.     Crocs is a casual lifestyle footwear company, and in December 2021, the Company announced that it had agreed to acquire HEYDUDE, a privately held footwear brand focusing on casual, comfortable, and lightweight footwear.  Crocs completed its acquisition of HEYDUDE on February 17, 2022.

17.     Following the announcement of the HEYDUDE acquisition, Defendants immediately began touting the brand's explosive growth potential by, for example, telling investors during the Company's Q4 2021 earnings call on February 16, 2022, that they were "excited about the potential of HEYDUDE and incredibly confident in our ability to build a $1 billion brand by 2024." Defendant Rees further assured the market that Crocs would achieve this goal by "leveraging the proven Crocs playbook to enhance HEYDUDE's growth trajectory," creating a "tangible pathway to a highly profitable combined company and tremendous value creation for shareholders."

18.     In the press release announcing the closing of the transaction on February 17, 2022, Crocs touted that "HEYDUDE is expected to be immediately accretive to our high revenue growth, industry-leading operating margins and earnings."  Throughout the first half of 2022, Defendants continued to boast about the immediate success of the acquisition as proof of organic wholesale

customer and consumer demand, when in reality, the "success" was due to Defendants' undisclosed channel stuffing activities.

19.     One of HEYDUDE's purported strengths that led the market to believe that Crocs would be able to significantly grow the brand's revenues was that HEYDUDE was a branded but relatively inexpensive line of shoes that the market believed did not face significant competition from less expensive knockoffs.  For example, a January 5, 2022 UBS analyst report on Crocs' acquisition of HEYDUDE discussed the bullish views of an "expert" on the shoe business who was simply identified as "a former VP of Planning for the footwear business at a major Department Store."  The UBS report summarized the expert's view that HEYDUDE did not face significant competition from knockoffs:

> The expert believes brands have staying power and that's why competitors who come up with "me-too" products rarely take big share.  Plus, the expert notes Hey Dude's $60 price point is low enough to dissuade rivals from trying to compete since it's hard to generate profit at that price point when going up against a competitor with scale.

20.     On May 5, 2022, in the Company's Q1 2022 earnings release, Defendant Rees stated that the Company's revenue growth was "a testament to the underlying strength of the Crocs and HEYDUDE brands."  Similarly, Crocs' Form 10-Q filed the same day stated that the Company intended to "leverage our global presence, innovative marketing, and scale infrastructure to grow HEYDUDE and to create significant shareholder value."

21.     In August 2022, Defendants represented that the HEYDUDE brand was performing even better than anticipated.  During the Company's Q2 2022 earnings call on August 4, 2022, the first day of the Class Period, Defendant Rees boasted that "HEYDUDE exceeded expectations, generating revenues of $232 million and impressive growth, almost doubling compared to last year."  Based on these reported results – which investors would later learn were driven by unsustainable shipments into the wholesale channel – Rees claimed that "HEYDUDE is one of the hottest brands

in the U.S. footwear market today because of the consumer love of the brand and its products." He further told investors that "while we are not yet ready to outline the longer-term potential, we believe it is significant, and we'll easily achieve our short-term goal of $1 billion in sales." He also boasted about Crocs' "disciplined" distribution strategy: "Our strategy utilizes the proven playbook of investing in great product and digital and social marketing, combined with a disciplined go-to-market and distribution strategy. This will result in robust U.S. growth from expanding wholesale distribution as well as strong digital growth."

22.    While after the acquisition, Crocs reported that HEYDUDE accounted for approximately 25% of the Company's total revenues in 2022 ($896 million out of $3.55 billion total), unbeknownst to investors, Crocs' "playbook," far from being "disciplined" and "proven," actually involved aggressively stuffing the wholesale channel with inventory to meet Crocs' aggressive revenue targets, while ignoring actual sell-through trends at the retail level.

### B.    Defendants' False and Misleading Statements

#### 1.    Statements Relating to the Second Quarter of 2022

23.    The Class Period begins on August 4, 2022, the day that Crocs reported its financial results for the second quarter of 2022. In the Company's Form 10-Q and Form 8-K, which attached the Company's earnings press release (the "August 4 press release"), Crocs reported total revenue of approximately $964.6 million and HEYDUDE revenue of approximately $232.4 million (24.1% of total revenue). The August 4 press release stated that HEYDUDE's Q2 2022 revenue represented an increase of "approximately 96% compared to 2021." A majority of this HEYDUDE revenue was attributed to the brand's wholesale channels. The Company reported approximately $162.5 million in quarterly wholesale revenue for HEYDUDE, or around 70% of the brand's total quarterly revenue. Defendant Mehlman signed the Company's Form 10-Q and Form 8-K and she and Defendant Rees certified the Form 10-Q's accuracy and completeness under Section 302 of the

Sarbanes-Oxley Act.

24.    In conjunction with these reported figures, Defendant Rees stated in the August 4 press release:

> HEYDUDE continues to outperform our expectations and we now expect nearly $1 billion in pro forma revenues this year. . . . The consumer demand for both our brands is exceptional and we expect both brands to gain market share in this dynamic environment.  We remain incredibly confident in our long term growth and our ability to generate best-in-class profitability.

25.    The August 4 press release also stated: "With respect to 2022, we expect: . . . Revenues for the HEYDUDE Brand to be approximately $850 to $890 million on a reported basis, implying $940 to $980 million, including the period of time prior to the closing of the acquisition."  For the third quarter of 2022, the August 4 press release stated that Crocs "expect[ed] . . . HEYDUDE Brand revenues of approximately $235 to $255 million."

26.    During Crocs' investor conference call on August 4, 2022 (the "August 4, 2022 earnings call"), Defendant Rees cited these revenue figures and stated: "HEYDUDE exceeded expectations, generating revenues of $232 million and impressive growth, almost doubling compared to last year.  Rees also stated: "Following strong HEYDUDE performance in H1, we now expect 2022 revenues of between $850 million and $890 million, which is nearly $1 billion on a pro forma basis."

27.    During the same call, Defendant Mehlman said "HEYDUDE revenues continue to exceed our expectations and almost doubled from last year. . . . HEYDUDE revenues of $232 million, . . . a record, were up 96%."  She added: "Turning to HEYDUDE.  Revenues exceeded expectations, contributing $232 million and growing 96% from pro forma 2021 revenues.  We are excited to see the success of the brand during our first full quarter of ownership and expect the new branding and implementation of the Crocs playbook to fuel future growth."

28.    However, while disclosing these revenue figures, Crocs did not disclose to the

investing public materially adverse facts necessary to make these statements regarding revenue and growth not misleading.  Specifically, while making the statements noted in ¶¶23-27, Defendants misrepresented the Company's revenue figures and their significance, including because they failed to simultaneously disclose that: (i) the Company was contemporaneously engaged in a deliberate strategy to deliver excess merchandise into its wholesale channels in amounts far exceeding consumer demand in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the reported revenue and growth figures were attributable to this strategy and were unsustainable after 2022, as wholesale customers would reduce their purchases of HEYDUDE products while selling down excess inventory purchased in 2022.

29.    In addition to misleadingly disclosing HEYDUDE's revenue growth without disclosing the channel stuffing that drove that growth, Defendants also misrepresented the growth's drivers and Crocs' distribution strategy.  On the August 4 earnings call, Defendant Rees stated that Crocs' growth was based on consumer demand and on a "disciplined," "proven" distribution strategy:

> In the light of the current environment, we're very focused on managing the business prudently in order to maintain high levels of profitability and strong cash flow. During our call today, we will outline how Crocs, Inc. will continue to gain market share, both as a result of the growth momentum of HEYDUDE and the growing consumer demand globally for the Crocs brand.
>
> HEYDUDE is one of the hottest brands in the U.S. footwear market today because of the consumer love of the brand and its products.  We're investing rapidly in the capabilities that will allow us to sustain the growth potential of the brand.  While we are not yet ready to outline the longer-term potential, we believe it is significant, and we'll easily achieve our short-term goal of $1 billion in sales.
>
> Our strategy utilizes the proven playbook of investing in great product and digital and social marketing, combined with a disciplined go-to-market and distribution strategy.  This will result in robust U.S. growth from expanding wholesale distribution as well as strong digital growth.

30.     Also during the August 4, 2022 earnings call, Defendant Rees stated, "[w]e will continue to . . . keep inventories lean," and specifically addressed the wholesale distribution channels and the wholesale inventory for the HEYDUDE brand.  Rees represented that the HEYDUDE brand's wholesale customers were "very pleased" with the distribution of its products.  He further described the wholesale customers' "exuberant enthusiasm" and Crocs' "strong and thoughtful" "playbook" for growing the business:

> As we look to the longer term, and specifically receptivity from sort of major wholesale partners, we're seeing, I would say, exuberant enthusiasm from wholesale partners that are taking on the brand.  We've shipped a substantive amount of product to a number of key partners so that they could be in business for back-to-school.  And I think the comments that we're hearing are things along the line, it's the standout for our back-to-school.  It's really performing above almost any other brand we have in our portfolio.

> So we're seeing very, very strong performance from that, which obviously then gives us confidence to plan share of shelf in those partners and to plan our growth for the future.  We're not yet ready to talk about what we think that looks like.  It's very early days.  But I think you can be confident that we'll follow the playbook that we followed at Crocs', we'll build a strong and thoughtful domestic business here in the U.S., and we think we're pretty confident the brand has a lot of legs internationally as well.  So we're pretty excited.

31.     In fact, during the call, when an analyst from Seaport Research Partners asked about "wholesale sell-through" and whether the "year over year growth" was attributable to "filling that pipeline[,]" Defendant Rees denied that was the case.  Rather, he stated, "I think the best way of getting at the core of your question is wholesale sell-through," and explained that the Company's "major partners" report to the Company, but not "all of the smaller partners."  He continued: "I think the retailers that do stock HEYDUDE would say sell-through is exceptional."  Further, Rees described the distribution of HEYDUDE products to "major wholesale customers" as "really a little bit hand to mouth today," with a goal of achieving "much more compelling assortments" in 2023 –

suggesting that Crocs was barely meeting wholesale customers' demand for HEYDUDE products.[2]

32.     In response to a question from a UBS Investment Bank analyst about HEYDUDE's "new door opportunity" (*i.e.*, new distribution channels), Defendant Rees highlighted the brand's opportunity to obtain both new wholesale customers and rapid inventory turnover in wholesale customers' stores:

> [Y]ou can see HEYDUDE in places you haven't seen it before, whether it be a, as you said, Famous Footwear, Rack Room Shoes, Academy, et cetera, some Dick's Sporting Goods, et cetera.  We have shipped them what we have available, and that is by no means what we consider to be a full assortment or by no means penetrating all of their doors.  So I would say the door expansion opportunity is very substantive for HEYDUDE.  Not only the door expansion, but the assortment in those doors and the ability to turn quickly.  So I think there's lots of runway there.

33.     Defendant Mehlman also spoke about Crocs' purportedly "tightly" managed wholesale distribution channels: "Since our prior guidance, we have seen a strengthening U.S. dollar, ongoing shutdowns in China, and we are also anticipating a continued weakening in consumer confidence.  As such, we are planning our own DTC more cautiously and are helping manage our inventory and our wholesale partners more tightly."  She also noted that HEYDUDE's inventory "turns very quickly and that's very efficient as that's mostly wholesale."  Defendant Mehlman also represented that HEYDUDE's sales were driven by "heavy wholesale demand in Q2, shifting the channel mix from DTC to wholesale . . . ."

34.     The statements quoted in ¶¶29-33 were materially false and misleading when made, including because, contrary to these representations that HEYDUDE's wholesale channel inventory was under control and that "sell-through [was] exceptional[,]" Defendants were aware that: (i) the Company was deliberately shipping excess product to Crocs' wholesale customers in amounts far

---

[2] "Hand-to-mouth" means "having or providing nothing to spare beyond basic necessities." MERRIAM-WEBSTER DICTIONARY (12 ed.2025), https://www.merriam-webster.com/dictionary/hand-to-mouth (last visited December 15, 2025).

greater than consumer demand in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the HEYDUDE growth levels reported to investors were largely attributable to Defendants' channel stuffing activities (*i.e.*, shipping excess product to wholesale customers) and were unsustainable beyond 2022, as those customers would reduce their purchases of HEYDUDE products while selling down the excess inventory purchased in 2022.

**2.      Statements Relating to the Third Quarter of 2022**

35.      On November 3, 2022, the Company reported its financial results for the third quarter ended September 30, 2022.  In the Company's Form 10-Q and Form 8-K, which attached the Company's earnings press release (the "November 3 press release"), Crocs reported that HEYDUDE revenues during the third quarter were $269.4 million, 67% of which (or $181.8 million) consisted of wholesale revenue.  According to these disclosures, the total quarterly HEYDUDE brand revenue represented an 87% increase when compared to the third quarter of 2021, and HEYDUDE revenue represented approximately 27.3% of the Company's total revenues for the quarter.  The November 3 press release quoted Defendant Rees as stating that the "strength of the Crocs and HEYDUDE brands" was responsible for the Company's "exceptional third quarter results, including record revenue[.]"  Defendant Mehlman signed the Company's Form 10-Q and Form 8-K, and she and Defendant Rees certified the Form 10-Q's accuracy and completeness under Section 302 of the Sarbanes-Oxley Act.

36.      The November 3 press release also stated that for the full year 2022, the Company expected "HEYDUDE Brand revenues to still be approximately $850 to $890 million on a reported basis, implying $940 to $980 million, including the period of time prior to the closing of the acquisition."  Under "Long-Term Projections," the November 3 press release stated: "We expect: . . . HEYDUDE Brand revenues to now be over $1.0 billion in 2023."

37.    Defendants further discussed Crocs revenue and growth during the Q3 earnings call held on November 3, 2022 (the "November 3 earnings call").  Defendant Rees stated: "HEYDUDE brand revenues were $269 million, representing revenue growth of 87% versus prior year," and "[t]he brand is one of the fastest-growing casual footwear brands in the U.S. market today, and we now expect revenues to exceed $1 billion in 2023, a full year earlier than previously committed." Rees also emphasized Defendants' "tremendous confidence and clear evidence as to the underlying strength and growth potential for both [Crocs] and the HEYDUDE brands."

38.    Similarly, Defendant Mehlman stated on the November 3 earnings call that HEYDUDE's revenues "continued to exceed expectations, contributing $269 million for our portfolio and growing 87% from Q3 2021 revenues.  The momentum of the HEYDUDE brand has been exceptional and we remain confident about realizing the full potential the Crocs play[book] will have on the brand."  She added: "With respect to HEYDUDE, we are maintaining our full year guide and are confident in our revenue expectations of between $850 million to $890 million on a reported basis, implying $940 million to $980 million on a pro forma basis."

39.    The disclosure of these "record" numbers and their significance was materially misleading, however, because Defendants did  not disclose  materially adverse facts in their possession at the time related to these figures.  In making the statements quoted in ¶¶35-38, Defendants failed to disclose that: (i) the Company was contemporaneously engaged in a strategy to deliver excess merchandise into its wholesale channels in amounts far greater than consumer demand in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the reported revenue and growth figures were largely attributable to Defendants' channel stuffing activities and were unsustainable beyond 2022 because wholesale customers would reduce their

- 12 -

purchases of HEYDUDE products while selling off the excess inventory purchased in 2022.

40.    During the November 3 earnings call, Defendant Rees assured investors that consumer demand was driving HEYDUDE's revenue growth: "Consumer demand for both the Crocs and HEYDUDE brands is exceptional and led to strong double-digit revenue growth."  In response to a question about whether revenue growth was due to "store expansion versus breadth and depth of product within existing distribution," Rees said both factors contributed to growth in 2022 and would continue to do so in 2023 and beyond: "For HEYDUDE in the past 6 months since we've owned it, we've actually expanded distribution quite a lot already but there is clearly more to come in '23 and beyond, and there is international on top of that, plus it's also share of shelf, like the places where we've expanded distribution we really have minimal shelf presence, and we envisage a lot greater shelf presence for the brand in the future.  So it's both."

41.    Defendant Rees further assured investors that the Company was not engaging in channel stuffing and that the Company was seeing strong "sell-through" (*i.e.*, sales to consumers). When a Piper Sandler analyst asked how the Company was managing its wholesale inventory, Rees told investors that Crocs was achieving "strong sell-throughs":

> [T]he benefit of both brands give us leverage of our shared services, which is particularly important. . . . I think what we – as we approach our kind of wholesale partner management, we try and be really disciplined in terms of what inventory did they hold and making sure that they're seeing strong sell-throughs.  As I mentioned, U.S. wholesale sellout was up high single digits.  So that's over the same period last year.  So we had actually strong consumer demand and strong sell-out.  But I think what we're seeing is our wholesale customers are being really prudent in terms of how they manage their business in terms of managing their overall inventory levels and we're not going to play the game of forcing inventory into them and getting them overstocked.

42.    However, these assurances were not truthful.  Specifically, the statements quoted in ¶¶40-41 were materially false and misleading when made, including because Defendants were aware that: (i) the Company was deliberately shipping excess product to Crocs' wholesale customers in

amounts far greater than consumer demand in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the reported HEYDUDE growth levels were largely attributable to Defendants' channel stuffing activities (*i.e.*, the shipping of this excess product to its wholesale customers) and were unsustainable beyond 2022, as those customers would reduce their purchases of HEYDUDE products while selling off the excess inventory purchased in 2022.

### 3. Statements Made at the Morgan Stanley Global Consumer and Retail Conference

43.     On December 6, 2022, Defendants Rees and Mehlman attended the Morgan Stanley Global Consumer and Retail Conference, where they continued touting HEYDUDE's performance. Regarding the HEYDUDE brand, Defendant Rees stated: "It will be close to $1 billion this year. We've talked about it being over $1 billion next year with a lot of certainty." Defendant Mehlman echoed this point: "We obviously feel like we'll have nice growth for HEYDUDE next year, which would be above the $1 billion" forecast. Defendant Rees further emphasized HEYDUDE's "exceptional growth" and stated: "we expect a long trajectory of growth opportunities within HEYDUDE[.]"

44.     However, while referencing HEYDUDE's revenue and growth numbers and communicating with investors about its growth opportunities, Defendants failed to mention that the Company was deliberately providing excess product to Crocs' wholesale customers in amounts far greater than consumer demand in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes. Accordingly, these statements by Defendants Rees and Mehlman in ¶43 were misleading to investors, including because they failed to disclose: (i) that Crocs was engaged in a deliberate channel stuffing strategy; and (ii) that the Company's wholesale figures included

significant revenues from Defendants' channel stuffing activities and were not sustainable beyond 2022, as wholesale customers would reduce their purchases of HEYDUDE products while selling off the excess inventory purchased in 2022.

45.    Also during the conference, Defendant Mehlman indicated that because of supply constraints, Crocs was actually delivering fewer HEYDUDE products than its customers were ordering:

> So when we bought the HEYDUDE brand, we had a lot of confidence that it was a scale brand, which was one of the attractive investment qualities that we liked about the brand.  But we were unsure about the supply environment and how steady their supply chain was and that actually proved to be better than what we thought.  So we were able to satisfy more of the order book than what we had originally anticipated.

46.    The statement quoted in ¶45 was false and misleading, including because far from filling less than all of the HEYDUDE "order book," Crocs was actually delivering excess inventory to its wholesale customers in amounts greater than those customers could sell to consumers in an effort to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes.

**4.    Statements Made at the ICR Conference**

47.    On January 10, 2023, Defendants Rees and Mehlman attended the ICR Conference, where they again emphasized the HEYDUDE brand's growth and significance to Crocs' overall finances.  Defendant Rees reiterated that HEYDUDE brought in "a little over $890 million" since the acquisition date less than a year earlier on February 17, 2022 and that "the full year revenues is pretty close to $1 billion at about 70% growth over the prior year."  Rees added that Crocs was "thrilled" with the acquisition:

> [I]t continues to outperform in terms of its growth, in terms of its consumer resonance and in terms of our perspectives on where we [are] thinking to go in the future.  If you remember, when we first bought the company, we indicated we thought sort of 2022 revenues of between $700 million and $750 million, and now

we're at $1 billion.  So it's clearly exceeding our expectations [from] when we took it on board.

48.     Defendant Rees also said that HEYDUDE expected continued growth in its wholesale business: "HEYDUDE will continue to deepen its relationships with key wholesale customers, and we see significant expansion in key wholesale customers here in the United States as well as that international growth I talked about."

49.     Defendant Mehlman referred to HEYDUDE's "performance . . . [of] almost $1 billion" as "really stunning."  In emphasizing the importance of these figures, Defendant Mehlman told investors: "We had very high revenue growth this year from both our acquisition from HEYDUDE as well as Crocs."

50.     The statements made at the ICR Conference, as quoted in ¶¶47-49, were materially misleading, including because Defendants, while claiming that Crocs was outperforming growth expectations, failed to disclose that: (i) the Company was delivering excess product to its wholesale channels in amounts far greater than consumer demand as part of a deliberate strategy to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the growth and revenue numbers were actually due to Defendants' channel stuffing activities and were not sustainable beyond 2022, as wholesale customers would reduce their purchases of HEYDUDE products while selling off the excess inventory purchased in 2022.

**5.      Statements Relating to the Fourth Quarter and Full Year 2022**

51.     On February 16, 2023, Crocs reported fourth-quarter and full-year financial results for 2022 in its Form 10-K and Form 8-K, which attached the Company's earnings press release (the "February 16 press release").  The Company reported approximately $279.2 million in total quarterly revenues for HEYDUDE, with approximately $143 million attributable to wholesale.  The February

16 press release further explained that HEYDUDE's full-year revenues were "$895.9 million for the period following the closing of the acquisition on February 17, 2022 with wholesale revenues of $574.1 million and DTC revenues of $321.7 million." Defendant Mehlman signed the Company's Form 8-K, and Defendants Rees and Mehlman signed the Company's Form 10-K and certified its accuracy and completeness.

52.    The February 16 press release quoted Defendant Rees as attributing HEYDUDE's "record revenues" in 2022 to consumer demand and stating that HEYDUDE would have "another record year in 2023": "Consumer demand for the Crocs and HEYDUDE brands has been exceptional, fueling record 2022 revenues for both brands at a combined $3.6 billion . . . . We anticipate another record year in 2023 with growth expected to be led by . . . increased US market penetration for HEYDUDE." The February 16 press release also stated that Crocs expected HEYDUDE's revenues "to grow mid-20% on a reported basis" in the full year 2023.

53.    Defendants expounded on the alleged significance of these numbers during the February 16, 2023 investor call (the "February 16 earnings call"). Defendant Mehlman stated that the Q4 2022 HEYDUDE revenues of $279 million represented an increase of "36.6% from Q4 of '21." Mehlman added: "For HEYDUDE brand revenues [in the full year 2023], we expect growth to be in the mid-20s on a reported basis." Defendant Rees stated: "HEYDUDE brand revenues exceeded initial expectations and reached nearly $1 billion on a pro forma basis and delivered over $275 million in adjusted operating income." He continued: "We've also seen great initial results [for HEYDUDE] exceeding our expectations. Brand revenues in 2022 grew 70% on a pro forma basis, driven by wholesale partner expansion in the United States." Rees also explained that HEYDUDE accounted for "27% of '22 revenues on a pro forma basis . . . ."

54.    However, despite Defendants' assurances regarding the strength of HEYDUDE's

revenue numbers, Defendants failed to disclose to the investing public materially adverse facts in their possession at the time relating to these revenue and growth figures. Specifically, while making the statements quoted in ¶¶51-53, Defendants misrepresented the figures' strength, including because they failed to disclose that: (i) the Company was deliberately delivering excess HEYDUDE merchandise to its wholesale customers in amounts far greater than consumer demand to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the reported revenue and growth figures were largely attributable to Defendants' deliberate channel stuffing activities and were unsustainable beyond 2022, as wholesale customers would reduce their purchases of HEYDUDE products while they sold off the excess inventory purchased in 2022.

55.    Defendants also misrepresented during the February 16 earnings call that HEYDUDE's revenue growth was driven by wholesale customer demand that was even beyond Crocs' ability to satisfy. In response to a BNP Paribas analyst's question about "how much more room there is domestically for the [HEYDUDE] brand in terms of wholesale door penetration," Defendant Rees stated that further growth was expected in 2023 and beyond – in numbers of wholesale customers, in shelf space per wholesale customer, and in sell-through to consumers – but that Crocs' distribution capacity for HEYDUDE was not yet equal to customer demand:

> So we've made really good progress in our first year of ownership in sort of wholesale door penetration in the U.S., right? So we're really pleased with the progress we've made and as you kind of implied in your question, that has fueled our growth. As we look at 2023, we do feel like there is incremental door penetration, and there's still long-term door penetration available in the U.S. There are still a number of key and significant customers that we have not yet penetrated that we're obviously working on. And I think in addition to that, there's a lot of share by door opportunity, right? . . . So as we invest in marketing to drive awareness, we will see both door penetration. We'll [see] expansion of share by door, and we will see, we believe, an increase in rates of sell-through. So that will be somewhat constrained in 2023, because we're dealing with a constrained distribution network where our D&L [distribution and logistics] capabilities are not consistent with our growth potential.

So -- but over the long run, we see lots of runway for North American growth in HEYDUDE.

56.    Defendant Rees also stated on the February 16 earnings call that Crocs had needed to expand HEYDUDE's distribution capacity to satisfy customers' supposed "throughput needs": "We've expanded [HEYDUDE's] distribution capabilities to handle the immediate throughput needs . . . ."

57.    Similarly, Defendant Mehlman answered a Baird analyst's question by stating that "HEYDUDE is expected to increase year-over-year but will ramp slower throughout the year, because we need to continue to work through the subscale D&L network."

58.    Despite being presented with the opportunity to come clean about HEYDUDE's excess "channel" (*i.e.*, wholesale customer) inventory when discussing issues with the Company's "owned" inventory, Defendant Mehlman instead doubled down and stated: "[W]e're actually very satisfied with inventory that we have in channel from a HEYDUDE perspective."

59.    These statements regarding the wholesale channel inventory's health and the product sell-throughs' strength directly concealed the deliberate channel stuffing that Defendants engaged in during this period.  Specifically, the statements quoted in ¶¶55-58 were materially false and misleading when made, including because Defendants were aware that: (i) the Company was shipping excess product to Crocs' wholesale customers in amounts far greater than consumer demand as part of a deliberate strategy to compete with "knock-off" or "private-label" versions of HEYDUDE's shoes that were already on the market and were competing with HEYDUDE's brand-name shoes; and (ii) the reported HEYDUDE growth levels were largely attributable to Defendants' channel stuffing activities (*i.e.*, the shipping excess product to its wholesale customers) and were not sustainable beyond 2022, as the wholesale customers would reduce their purchases of HEYDUDE products while they sold off the excess inventory purchased in 2022.

C.    **While the Truth Begins to Emerge, Defendants Continue to Conceal the Full Extent and Ramifications of the "Pipeline Fill"**

1.    **Crocs' Earnings for the First Quarter of 2023**

60.    Defendants first partially revealed their channel stuffing activity on April 27, 2023. In the Company's quarterly earnings released that day, Crocs reported HEYDUDE quarterly revenue of $235.4 million – a figure that represented a sharp decline in the growth trend Defendants reported throughout the previous year and told investors they expected throughout 2023. During the earnings call the Company held later that day (the "April 27 earnings call"), Defendant Rees acknowledged that this revenue represented a growth percentage of "15% on a pro forma basis[.]"

61.    When asked about this "modest" growth in light of previous growth figures and the Company's previously disclosed expectations, Defendant Rees admitted for the first time that HEYDUDE's revenues from the prior year were the result of pipeline fill and channel stuffing:

> The other thing that's also important to bear in mind as you look to future quarters is the -- we had significant pipeline fills. So we opened a lot of big national accounts last year in Q2 and Q3. So when you open a big national account and you pipeline fill 400, 500, 600 doors, that's a significant amount of volume that you don't anniversary the following year. So you've also got to take that into consideration in Q2 and Q3.

62.    Analysts took note of this admission. Seaport Research Partners noted in an April 27, 2023 report that, based on the information revealed by Defendant Rees that day: "2Q22/3Q22 growth was somewhat overstated, partly driven by wholesale pipeline fill . . . 2Q23/3Q23 growth will likely be below 1Q23, as pipeline fill is lapped." A Wedbush Securities analyst report also pointed to the disclosed "channel fill" as the explanation for the surprising numbers, stating that HEYDUDE's "significant deceleration" was attributed in part to "lapping significant channel fill[.]"

63.    Crocs' stock price declined $23.46 per share, or nearly 16%, in response to this admission, falling from a closing price of $147.78 per share on April 26, 2023, to close at $124.32 per share on April 27, 2023.

64.     Despite partially disclosing the previously concealed pipeline fill, Defendants continued to mislead investors concerning the full reality and impact of the Company's deliberate channel stuffing scheme.  During the April 27 earnings call, Defendant Rees claimed that, regardless of the prior pipeline filling activity, the Company was now "well positioned in market with good inventories in many of [their] leading strategic wholesale customers" and that the Company's "inventory turning [was] performing well[.]"  When discussing HEYDUDE's subpar growth in the first quarter, Defendant Rees reassured investors by stating: "We're super confident in our kind of mid-20s growth rate that we've guided for the brand for the full year[.]"

65.     The above statements quoted in ¶¶60-62, 64 were materially false and misleading, including because Defendants were aware but did not disclose that: (i) HEYDUDE brand shoes faced significant competition from private label and knockoff shoes; (ii) the pipeline fill was more extensive than Defendants were indicating to the market; (iii) as a result, wholesale customers' HEYDUDE inventories remained and would remain unbalanced in the coming quarters; and (iv) Defendants' growth expectations were thus unattainable.

### 2.    The Robert W. Baird Global Consumer, Technology & Services Conference

66.     Just over a month later, Defendants provided investors with additional information concerning their deliberate channel stuffing practices, the concealment of that activity, and its impact on past revenue and growth figures.  On June 7, 2023, at the Robert W. Baird Global Consumer, Technology & Services Conference ("June 7 Baird conference"), Defendant Rees admitted:

> A big part of that growth last year was pipeline fill for some of those major US retailers that we were able to expand the brand into.  And I think on the left-hand side of this slide, what we're trying to highlight and break out for you all is the non-comp version.  That's the pipeline fill.  So $70 million in Q2, $60 million in Q3 of 2022 was pipeline fill.
>
> So when you're filling a major retailer, so take a [F]amous [F]ootwear or somebody with thousand stores, and you're putting a significant number of SKUs [stock

keeping units] on the shelf and you're putting a size run of each SKU in each store, obviously it adds up to a lot of units. And you don't sell through that all immediately. So what we're trying to highlight is a period here that . . . we won't be comping this year.

67.     Defendants also provided a graphic allegedly quantifying the pipeline fill:



68.     Additionally, Defendant Rees expounded on Defendants' "conscious" decision to

overstock the wholesale channels and the lack of clarity surrounding the HEYDUDE "pipeline fill":

I would say that pipeline fill, you could say, well, why wouldn't you do that more gradually over a number of years and smooth out the growth? It was a very conscious decision on our part to do that last year because we're very much aware that there is competition out in the marketplace. There are people selling a HEYDUDE knockoff or something that's very similar. And there are many of these retailers had private label – there was similar product on the shelf.

We knew our product will perform better and we wanted to secure that shelf space for the HEYDUDE brand. So that was a conscious decision we made. I think we probably could have done a better job being a little clear about that but we – that was a conscious decision we made.

69.     Defendants reaffirmed throughout the presentation that this strategy was intentional and had been concealed from investors.  Defendant Rees explained: "[T]he bumps that you would see in . . . the US wholesale business was intentional.  Apologies, we didn't do a good enough job explaining that."  Rees also stated: "[W]e actually expect the US wholesale business in Q2 and Q3 of this year to be negative.  We're not going to grow -- we're not going to comp the numbers that we had last year."

70.     Analysts incorporated this new information into their reports.  Piper Sandler adjusted its intra-quarter estimates "based on the latest investor presentation" in which the Company "clarif[ied] that wholesale is expected to be down in 2Q and 3Q for [HEYDUDE.]"  Wedbush similarly wrote: "As they lap such significant channel fill the next 2 quarters . . . wholesale growth is planned negative in Q2/Q3."

71.     In response to these statements by Defendants, Crocs stock price fell $4.52 per share, or nearly 4%, from a closing price of $121.09 per share on June 7, 2023, to close at $116.57 per share on June 8, 2023.

72.     However, at the June 7 Baird conference, Defendants downplayed the effects of the pipeline fill by indicating that their deliberate strategy to compete with knockoffs would be supported by HEYDUDE's sell-out numbers and brand strength.  Immediately following the pipeline fill discussion, Defendant Rees touted a sell-through rate of 143%, and stated that, although this figure was non-comp, the sell-through rates disclosed by Defendants implied the brand "is growing, it's gaining penetration and . . . is acquiring new customers."

73.     The market was falsely reassured by Defendant Rees's statements about the sell-through rate that seemingly supported the Company's deliberate strategy to address knock off concerns by engaging in channel stuffing activities.  For example, a June 7, 2023 Wedbush

Securities analyst report commented on Rees's statements at the Baird conference that day: "One interesting tidbit on HeyDude was that when they enter a new wholesale door, they experience strong sell-through trends even if that retailer already had a 'knock off brand' in their assortment." Wedbush accepted the Company's false reassurances, concluding: "We continue to believe that the concerns over the recent slowdown at HeyDude are overblown (a function of tough compares and capacity constraints, not slowing demand)[.]"

74.    These statements in ¶¶66-69, 72 were misleading because (i) the pipeline fill was more extensive than disclosed; (ii) demand was not as strong for the HEYDUDE product as the sell-out data might suggest; and (iii) as a result, this sell-out data could not support Defendants' deliberate channel stuffing activities by counteracting the negative effects of the pipeline fill on the Company's financials.

### 3.    Crocs' Earnings for the Second Quarter of 2023

75.    When Crocs announced its results for the second quarter of 2023, investors learned further details about the reality of HEYDUDE's revenues and growth potential.  In its July 27, 2023 earnings press release (the "July 27 press release"), the Company reported that HEYDUDE's "[w]holesale revenues declined 8.4% to $148.8 million following pipeline fill in the same period last year."  On the Company's July 27, 2023 earnings call (the "July 27 earnings call"), Defendant Mehlman explained that the Company was now lowering HEYDUDE's revenue growth outlook to between 14% and 18%, down from the mid-20% figure stated to investors the previous quarter. Defendant Rees partially attributed this drop in both revenue and growth to Defendants' channel stuffing activity: "[T]he last part of last year's revenue related to pipeline fill for some of [HEYDUDE's] strategic alliance partners."  Discussing the effect of Defendants' "very conscious decision" to overstuff HEYDUDE's wholesale channels, Rees further stated: "As we look towards the remainder of the year for HEYDUDE, we are lowering our outlook for revenues.  Wholesale

growth is expected to be low."

76.    Additionally, despite Defendants' prior statements regarding the strength of their confidence in wholesale inventory and their wholesale customers, Defendant Rees confessed for the first time that "many [wholesale customers] are cautious in terms of future bookings[.]"  In answering a question regarding HEYDUDE's growth prospects, Rees further explained the slow growth: "As we look at the back half of the year, we're reducing our expectations for the brand, principally related to wholesale . . . . [A]s I talked about in prepared remarks, we've got $220 million of sell-in [*i.e.*, "pipeline fill" sales to wholesale customers] that we did last year that is pretty hard to com[p]."

77.    In response to the same question about HEYDUDE's growth prospects, Defendant Mehlman also connected the reduced growth outlook to the previously concealed pipeline fill:

> I think the biggest thing for Q3 is just to remember, we're still dealing with, as Andrew mentioned, the non-comp business of HEYDUDE or the pipeline fill.  So for Q3, we do expect HEYDUDE to be down, and . . . that's really related to the wholesale part of the business . . . and you can see from our presentation, we had about $60 million of pipeline fill [in Q3] last year.

78.    Analysts who followed Crocs remarked on these new disclosures and indicated the concern circulating within the market.  For instance, a Piper Sandler analyst report noted that "[HEYDUDE] was negatively impacted by challenging wholesale comps as we lap last year's account sell-in amidst a cautious wholesale environment[,]" and Piper Sandler decreased its price target for Crocs stock "due to a more cautious growth outlook for the [HEYDUDE] brand."  A Wedbush Securities analyst report similarly noted that "[a]s [HEYDUDE] laps [last year's] significant wholesale channel fill . . . they've seen growth significantly slow."  Further, the Wedbush report told investors: "[I]t's disappointing that they're cutting [HEYDUDE] guidance and seeing revenues are already declining.  This probably won't do much to alleviate investor concerns over the brand's potential over-distribution."

79.     In response to these additional disclosures by Defendants, the price of Crocs common stock declined $17.50 per share, or nearly 15%, from a closing price of $119.80 per share on July 26, 2023, to close at $102.30 per share on July 27, 2023.

80.     To counteract the negative impact of these disclosures, Defendant Rees made additional reassurances during the July 27 earnings call concerning the HEYDUDE brand's "sell-out" (*i.e.*, consumer sales) rate: "[T]he HEYDUDE sellout is also very strong.  I think we gave you some visibility to that in the strategic partners.  It's up dramatically, I think close to 8% and sell-out in aggregate across all channels, our estimates, at least is up 27%.  So consumer takeaway is strong.  It's definitely performing at wholesale[.]"  The market responded to these reassurances.  For instance, despite Wedbush Securities' concern quoted in ¶78, the report noted that the "[t]he silver lining was that total sell-through for the brand was +27%."

81.     In making the statements quoted in ¶¶75-77, 80, Defendants continued to mislead the market about the impact of the HEYDUDE pipeline fill.  Specifically, these statements were false and misleading, including because: (i) the Company continued to obscure the extent of Defendants' channel stuffing activities; and (ii) Defendants were aware but did not disclose that the Company's sell-out numbers were insufficient to counteract the revenue effects of the wholesale pipeline fill.

### 4.    Williams Trading Cuts Its Price Target for Crocs Stock

82.     A few weeks later, on August 16, 2023, Bloomberg reported that, in light of previously nonpublic information concerning HEYDUDE's wholesale inventory levels, Williams Trading reduced its price target for Crocs common stock from $145 per share to $113 per share.  During meetings with numerous HEYDUDE wholesale accounts at the Atlanta Shoe Market tradeshow, Sam Poser ("Poser"), an analyst for Williams Trading, learned there was "concern about inventory levels at [HEYDUDE's] approved retailers[.]"

83.    The investment-news website Seeking Alpha also reported Williams Trading's move, stating that Poser pointed to "potential wholesale issues for the HEYDUDE business," including "the amount of HEYDUDE product that's in the marketplace[.]" Seeking Alpha quoted Poser as writing: "More mature, but ongoing, wholesale accounts are likely planning HEYDUDE down in 2024."

84.    In response to this news, Crocs common stock fell $3.79 per share, or nearly 4%, from a closing price of $97.80 per share on August 15, 2023, to close at $94.01 per share on August 16, 2023.

### 5.    Crocs' Earnings for the Third Quarter of the 2023

85.    On November 2, 2023, Defendants revealed even more disappointing news to the market in the form of Crocs' third quarter earnings. As stated in the Company's press release that day (the "November 2 press release"): "Revenues during the third quarter decreased 8.3% to $246.9 million . . . . Wholesale revenues declined 19.4% to $146.5 million following prior year pipeline fill and as our wholesale partners were more cautious on at-once orders." During the Company's earnings call held later that day (the "November 2 earnings call"), Defendant Rees provided additional information concerning the extent of Defendants' channel stuffing activities. For instance, he told investors that the Company "sold in a lot of inventory in 2022 into the market," and "the level of inventory was too high" – a reality that would require "clean up" that would be "painful" for the Company's sell-in revenues in the coming quarters.

86.    Defendant Rees indicated to investors that the pipeline fill adversely affected HEYDUDE's wholesale revenues: "[W]e are anniversarying last year's pipeline fill . . . . What has changed since we last updated you in July, retailers are more cautious around our HEYDUDE brand and at-once demand was lighter than we previously expected."

87.    Defendant Mehlman also referred to the pipeline fill as an explanation for the lackluster revenue figures: "Wholesale revenues were down 20% from Q3 last year, as we continue

to lap pipeline fill and as lower consumer footfall led to retailers taking a more conservative approach to at-once orders."

88.    Analysts responded negatively to this new information.  Piper Sandler lowered its fiscal year 2024 EPS estimate on November 2, 2023, "largely due to lower [HEYDUDE] estimates," and simultaneously reduced its price target.  In discussing management's guidance on HEYDUDE's inventory issues, Piper Sandler noted that the Company "is actively working to clean up marketplace inventory within the wholesale channel, and wholesale partners are displaying caution on orders[.]"

89.    Similarly, Wedbush Securities stated  on November 2, 2023 that "[HEYDUDE] continues to deteriorate" and that "the decline is being driven" in part by "inventory cleanup in the wholesale channel[.]"  This news led Wedbush to cut its EPS estimates and to cut its price target from $133 to $96.  In discussing this drastic cut, Wedbush noted "the stock will likely languish until we get evidence that [HEYDUDE] has bottomed" and that "management has a long hill to climb in order to regain investor trust."

90.    In response to this new information from the Company, Crocs' stock price fell $4.62 per share, or more than 5%, from a closing price of $87.41 per share on November 1, 2023, to close at $82.79 per share on November 2, 2023.

91.    However, while making these disclosures to the market, Defendant Rees falsely reassured investors by conveying that the Company was finally turning a corner in its wholesale inventory management, that the Company was devoting the necessary resources to cleaning up the channels and rebalancing inventory levels, and that sell-out levels would help carry HEYDUDE through this period:

> [W]e're taking down our sell-in expectations to allow us to lower in-channel inventories.  We're doing that in a number of ways.  One, proactive cancellation of prior orders, so that there's less inventory flowing into the channel.  We're also supporting our wholesale partners with some inventory cleanup that includes both

returns and also some markdown funding so they can clean their inventories in the fourth quarter of this year.  The strategic accounts in the Q3 were up 28% in terms of their sellout.  And we think they will continue to grow in terms of sellout.

92.    Further, Defendant Rees elaborated that the Company was "proactively lowering in channel inventories" and "clean[ing] up" that inventory in order to put their wholesale customers "in a stronger sell-through and a more profitable position.  That's painful in terms of sell-in, which is what you see showing up in our Q4 guidance and what you see in our anticipated Spring '24 order book."

93.    Analysts took note of these reassurances in their reports.  For example, as detailed in ¶88, a November 2, 2023 Piper Sandler analyst report emphasized Defendants' representations that the Company was "actively working to clean up marketplace inventory within the wholesale channel[.]"

94.    However, the statements quoted in ¶¶85-87, 91-92 were materially misleading when made, including because: (i) the Company was continuing to obscure the extent and ramifications of Defendants' channel stuffing activities; and (ii) the necessary associated cleanup of these channels was thus more extensive than disclosed.  In fact, the investing public would not learn for another year how far the channel stuffing scheme truly went.

### D.    The Truth Continues to Gradually Emerge as Defendants Attempt to Soften the Blow with False and Misleading Reassurances

#### 1.    Earnings for the Fourth Quarter and Full Year 2023 and February 15, 2024 Earnings Call

95.    On February 15, 2024, Defendants revealed Crocs' Q4 and full year financial results for 2023.  According to the earnings press release issued that day (the "February 15 press release"), HEYDUDE reported an 18.5% drop in Q4 earnings, only 6.0% revenue growth for the total year, and a 1.3% decrease in yearly wholesale revenues.  Defendants, however, painted a rosy picture during the earnings call the Company held that day (the "February 15 earnings call").  Defendant

Mehlman stated that despite the brand's struggles, "[f]or HEYDUDE brand revenues, we continue to expect growth to be flat to slightly up," and "we expect HEYDUDE sales trends to improve throughout the year."

96.    The statements quoted in ¶95 concerning HEYDUDE's revenues and expected growth were false and misleading when made, including because: (i) Defendants failed to disclose that wholesale customers were continuing to be wary of HEYDUDE products in light of Defendants' pipeline fill, and demand was not as strong as Defendants indicated; and (ii) the "expect[ed]" growth numbers were unrealistic in light of this information.

97.    That day, Defendants indicated that their inventory cleanup strategies were already in effect and showing promising results.  For instance, Defendant Rees told investors on the February 15 earnings call that although Crocs "made a number of strategic pivots in September, which impacted . . . sell-in within the wholesale channel," Defendants were "pleased with the initial impact of our decisions as evidenced by improved gross margins and healthy channel inventories and expect[ed] sell-in and sell-through to normalize as we move throughout the second half of 2024 and prioritize returning to a full market position."  Rees continued: "So we sold more in than we should have done.  We also have gone through the process of cleaning up our account base because I think we had too many accounts with too much inventory[.]"

98.    Despite these assurances, wholesale inventories would continue to have a materially adverse effect on Crocs' financial position throughout the year.  The statements quoted in ¶97 were false and misleading when made, including because: (i) Defendants' efforts to remedy the excess HEYDUDE inventory in Crocs' wholesale channels originally caused by the channel stuffing in 2022 were not succeeding; and (ii) the continuing excess inventory could not realistically be remedied by the end of 2024.

99.     Defendant Rees also made additional statements regarding HEYDUDE's brand power, consumer demand, and sell-out rate: "In the fourth quarter and on a full year basis, we gained market share among our key strategic accounts, underscoring our confidence in the [HEYDUDE] brand's underlying demand with consumers."  Rees specified:

> The underlying sellout for the HEYDUDE brand has been strong . . . . It is a top-performing brand for many of our wholesale partners, and it ranks highly in their brand stack.  The HEYDUDE brand during 2023 gained market share in the fashion casual category, actually substantial market share, we believe, based on the Circana data about 200 basis points.  So it was one of the larger market share gains, and that's in terms of consumer takeaway.

100.     The statements quoted in ¶99 were false and misleading when made, including because Defendants failed to disclose that the sellout for HEYDUDE and the brand's market share were insufficient to counteract the effects of the excess wholesale-customer inventory still afflicting the Company.

### 2.     April 16, 2024 Ratings Cut by Williams Trading

101.     On April 16, 2024, Bloomberg reported that Williams Trading analyst Sam Poser cut his recommendation from "buy" to "hold" in response to previously nonpublic information concerning the Company's sales.  Bloomberg explained that, according to Poser's report, "[r]ecent checks suggest that [HEYDUDE] sales haven't been strong enough to produce a y/y [year-over-year] increase this year[.]"  Although Poser noted that Crocs had replaced its Executive Vice President and HEYDUDE Brand President, Bloomberg summarized Poser's thoughts that the HEYDUDE brand president replacement "doesn't indicate a quick fix for the brand[.]"

102.     In response to this news, Crocs' stock price decreased $2.68 per share, or approximately 2.2%, from a closing price of $123.36 per share on April 15, 2024, to close at $120.68 per share on April 16, 2024.

### 3.    Earnings for the First Quarter of 2024

103.    On May 7, 2024, Crocs reported that HEYDUDE revenues decreased 17.2% to $195 million in the first quarter of 2024.  Further, although Defendants had indicated just one quarter earlier that HEYDUDE's yearly revenue growth would be flat to slightly up, the Company now cut the brand revenue yearly guidance – projecting instead a drop of 8-10%.

104.    However, during the earnings call Defendants held that same day (the "May 7 earnings call"), Defendants claimed that the lag in HEYDUDE's revenue and growth was being addressed by Defendants' wholesale-inventory cleanup efforts.  Defendant Mehlman stated: "Wholesale revenues were down 20% from last year as we focused on continued inventory management in the channel."  As for expected revenue for the coming quarters, Mehlman told investors that although Defendants projected that HEYDUDE revenues would decline slightly, Defendants ultimately "expect[ed] HEYDUDE sales trends to improve each quarter and expect[ed] the sell-in and sell-through dynamic to normalize into Q4."

105.    Defendants reassured investors that the wholesale-inventory cleanup efforts were already succeeding.  During the May 7 earnings call, Defendant Rees told investors: "On the wholesale side, we're pleased with the work we have done to clean up our account base."  Similarly, Defendant Mehlman said: "We feel really good about inventory.  We think that's the right level because we're at kind of 4x turns for both brands, which is where we target inventory turns . . . . Q1 last year, we were still cleaning up some of our inventories on the HEYDUDE side."

106.    The statements quoted in ¶¶103-105 were materially false and misleading when made because Defendants did not disclose the full reality of HEYDUDE's excess inventory and its adverse impact on the wholesale business.  Specifically, these statements were false and misleading, including because: (i) the Company was not successfully remedying the excess inventory plaguing wholesale channels that was originally caused by Defendants' channel stuffing activities in 2022;

and (ii) as a result, the Company's projections were unrealistic and unattainable.

### 4.    Earnings for the Second Quarter of 2024

107.    According to the Company's second quarter Form 10-Q and associated press release issued on August 1, 2024 (the "August 1 press release"), HEYDUDE's quarterly revenues decreased 17.5% to $198 million, with a decrease of 23.5% in the wholesale channel.  During the earnings call Defendants held that day (the "August 1 earnings call"), Defendant Rees admitted that HEYDUDE'S "wholesale . . . remains challenging, and we expect that to continue through the second half of the year."  He added: "[O]ver the last several months, it has not performed as we had hoped it would particularly here in the US marketplace."

108.    Analysts expressed concern in response to these subpar numbers and HEYDUDE's wholesale struggles.  BNP Paribas wrote: "We remain cautious on HEYDUDE until sell-out trends stabilize and start to improve."  BofA securities noted that the HEYDUDE "outlook is uncertain" and posited that the "brand may be losing momentum[.]"

109.    On this news, Croc's stock price fell by $3.56, or 2.65%, from a closing price of $134.37 per share on July 31, 2024 to close at $130.81 per share on August 1, 2024.  The price fell by $7.50, or 5.73%, the following day, with the stock closing at $123.31 per share on August 2, 2024.

110.    Despite the impact of these disappointing revenues, Defendants continued to reassure investors that the Company would start to recover in the coming quarters.  Susan Healy ("Healy"), who replaced Defendant Mehlman and became the Company's Executive Vice President and Chief Financial Officer on June 3, 2024, reiterated the guidance that HEYDUDE revenues would likely contract only 8-10% for the whole year, despite the nearly 18% revenue decrease for Q2 and low projections for Q3.  In justifying this guidance, Healy stated: "As we look to the fourth quarter for the HEYDUDE brand, we expect revenue growth to be supported by[,]" among other things, "the

timing of wholesale shipments . . . [and] sell-in to new international distributors[.]"

111.    Also on the August 1 earnings call, Defendant Rees told investors that HEYDUDE was making strides in inventory improvement.  Defendants "[had] made progress in improving the health of our underlying business in North America[.]"  Rees further claimed that this progress was "exemplified" in part by "inventories turning in excess of 4 times."

112.    Analysts took note of these reassurances regarding HEYDUDE's wholesale sector. For instance, Wedbush Securities stated it "[r]emained [b]ullish" on the stock.  In reaching this conclusion, Wedbush noted that Defendants "surprisingly reiterated [HEYDUDE's] FY outlook, for a decline of 8%-10% . . . . This implies Q4 growth of 12%-18%, which is a dramatic re-acceleration for this struggling brand.  The acceleration is attributed to timing of wholesale shipments, non-comp growth in Q4[.]"

113.    The reassurances quoted in ¶¶107, 110-111 were materially false and misleading when made, including because Defendants were aware that: (i) Defendants were not successfully remedying the excess inventory that was adversely affecting HEYDUDE's wholesale channels and was originally caused by Defendants' channel stuffing activities in 2022; and (ii) these continuing inventory problems could not realistically improve in the coming quarters sufficiently to meet Defendants' revenue guidance.

### E.    The Complete Truth About HEYDUDE's Inventory Problems Is Belatedly Revealed

114.    On October 29, 2024, Defendants finally disclosed to investors the full extent of their inventory management issues, originally caused by Defendants' own deliberate channel stuffing activities, and the reality that these problems had not been remedied.  On this date, Crocs reported HEYDUDE quarterly revenues of $204 million, a drop of 17.4% from the previous year.  Wholesale revenues fell nearly 23%.

115.    During the earnings call the Company held that same day (the "October 29 earnings call"), Defendants finally acknowledged that the yearly revenue figures for 2024 that they had projected throughout several prior quarters were unattainable. Healy corrected the prior misleading guidance: "For HEYDUDE, we're lowering our revenue range from down 8% to 10% to down approximately 14.5% based on lower than previously assumed sellouts in both wholesale and digital." Specifically, Healy explained that the fourth quarter revenues would suffer, dropping "4% and 6% in the quarter, below the former implied range of up low to mid-teens." Healy reiterated: "The largest driver of our lower revenue outlook is tied to lower-than-expected sellouts[.]"

116.    Defendant Rees also acknowledged the extreme revision: "[I]t will take longer than we initially planned for [HEYDUDE] to turn the corner." Furthermore, despite his prior reassurances that Defendants had cleaned up HEYDUDE's wholesale channel inventories, Rees admitted that "there is still work to be done" in managing and reducing HEYDUDE's wholesale channel inventories.

117.    During the Q&A portion of the October 29 earnings call, Sam Poser, the Williams Trading analyst, asked Rees directly: "At the . . . end of calendar '22 and the beginning of '23, you shifted a ton of product into marketplace. So I guess the question is this, how overstated were the sales last year? . . . And how much of just filling shelf space and things you did back then caused what happened now?" In response, Rees acknowledged that HEYDUDE "definitely grew too fast[.]" Finally taking responsibility for the impact of Defendants' channel stuffing activities on HEYDUDE's ongoing wholesale inventory issues, Rees told investors: "If you think about this '22 into '23 time frame, in retrospect, we absolutely ship[ped] too much product[]. So if you're asking what decisions we made that were wrong, that was wrong[.]"

118.    Analysts reacted negatively to the lowered guidance and revelations concerning HEYDUDE's wholesale business.  Williams Trading cut its Crocs price target from $163.00 to $140.00.  Poser wrote: "Today's weakness is due to the reduction of fiscal year 2024 Hey Dude revenue guidance, and the knowledge that stabilizing the brand, and turning it around [in] North America is more involved than what was previously expected[.]"   Seaport Research Partners reported that "For FY24, HEYDUDE guidance has been lowered dramatically."  This shift reflected "lower-than-expected wholesale and DTC sell-outs, which CROX attributes to a shift in spending from performance marketing to brand marketing."  However, Seaport Research Partners did not buy management's explanation for the HEYDUDE wholesale channel's problems, stating, "[g]iven the magnitude of the HEYDUDE revision, it's hard to believe that this is mostly due to a shift in marketing[.]"

119.    After the market finally learned that HEYDUDE's inventory and revenue problems would not be remedied as quickly as Defendants had previously indicated, the price of Crocs common stock fell $26.47 per share, or approximately 19.2%, from a closing price of $138.05 per share on October 28, 2024, to close at $111.58 per share on October 29, 2024.

## V.    ADDITIONAL SCIENTER ALLEGATIONS

120.    Defendants have admitted that their decision to push excess HEYDUDE products onto the Company's major wholesale customers from 2022 to early 2023 was deliberate, that this practice enhanced HEYDUDE's short-term performance, including the revenues at issue in this action, and that they did not adequately disclose these facts to investors.  As alleged in more detail above:

> (a)    Defendant Rees acknowledged on April 27, 2023, that "we had significant pipeline fills" at "a lot of big national accounts last year in Q2 and Q3" (¶61);

(b)     Rees acknowledged on June 7, 2023, that the pipeline filling activity "was a very conscious decision on our part to do that last year," and "that was a conscious decision we made" (¶68);

(c)     Rees also acknowledged on June 7, 2023, that "we probably could have done a better job being a little clear about that but we -- that was a conscious decision we made" (¶68);

(d)     Rees also acknowledged on June 7, 2023, that "the bumps that you would see in . . . the US wholesale business was intentional.  Apologies, we didn't do a good enough job explaining that" (¶69); and

(e)     Rees acknowledged on July 27, 2023 that the pipeline filling had been "a very conscious decision" (¶75).

Thus, Rees admitted that Defendants knowingly stuffed Crocs' wholesale channel with excess HEYDUDE inventory and failed to adequately disclose this fact to investors.

121.    Defendants also closely monitored inventory levels of HEYDUDE products held by Crocs' large wholesale customers.  During the June 7, 2023 Baird conference, Defendant Rees stated with respect to wholesale customers' HEYDUDE inventory and consumer sales that Crocs's major U.S. wholesale accounts provided "weekly tracking information on sellouts and inventory on hand and terms," which gave the Company "a lot of visibility and transparency."  Rees emphasized the Company's focus on "those major accounts," explaining that they were "key" in the U.S. marketplace.  Accordingly, Defendants were informed on an ongoing basis about the Company's major wholesale customers' inventory and sales and would have been particularly sensitive to any developments in those reports, including whether a major account was actually selling through its excess inventory.  Even as Defendants emphasized HEYDUDE's growth and revenue achievements for 2022, they failed to disclose that a substantial portion of that revenue was attributable to pipeline fill of excess inventory that their wholesale customers were not able to sell promptly to consumers, inevitably leading to lower sales to these wholesale customers in subsequent periods.

122.    Defendants Rees and Mehlman were also incentivized to engage in channel stuffing in 2022 because a majority of their annual compensation was based on the Company's financial performance, including HEYDUDE's revenues that resulted from Defendants' channel stuffing activities.  Executive compensation at the Company was structured into two categories: an annual base salary and "performance-based" or "at-risk" compensation.  Eligibility for the latter category was determined by the Company's annual performance, and this category consisted of two components: (i) an annual cash incentive award ("cash bonus"); and (ii) an annual equity incentive award, which consisted of time-based restricted stock units ("RSUs") and performance-based restricted stock units ("PSUs") (together, "stock awards").[3]  Eligibility for the cash bonus was measured by four performance targets: (i) global adjusted EBIT; (ii) global adjusted free cash flow; (iii) strategic initiative performance; and (iv) integration efforts.  These targets were weighted at 40% each for global adjusted EBIT and global adjusted free cash flow, both of which depend directly on Crocs' total revenues – including the HEYDUDE channel stuffing revenue – and 10% each for strategic initiative performance and integration efforts.  Similarly, the performance metrics used to determine eligibility for PSUs were: (i) adjusted revenue; (ii) adjusted EBITDA operating margin; and (iii) ESG progress, which was given minimal weight – 5% versus 47.5% for each of the other two metrics, both of which depended directly on total revenues, including HEYDUDE revenue.  Put simply, the vast majority of any cash bonus (80%) and any PSUs awards (95%) was based on the Company's financial metrics that were inflated by HEYDUDE's revenues resulting from Defendants' channel stuffing activities.

123.    According to the Company's 2022 proxy statement filed with the SEC on April 27, 2023 ("2022 proxy"), the Company achieved record annual revenues for 2022, with HEYDUDE

---

[3]     PSUs accounted for roughly 67% of the individual stock awards granted in 2022, 2023, and 2024.

contributing revenues of $895.9 million between the date of acquisition (in February 2022) through December 31, 2022, a point that the Compensation Committee specifically highlighted in its compensation assessment.  That year, **89%** of Rees's and **66%** of Mehlman's target compensation for the year was contingent upon achieving specified performance targets that depended heavily on HEYDUDE's revenues.  As described in the 2022 proxy, Defendants Rees and Mehlman earned additional compensation awards in line with these targets.  Based on the Company's 2022 financial results, including HEYDUDE's revenues resulting from Defendants' channel stuffing activities, Rees received $1,100,000 in base salary and $8,800,910 in performance-based awards.  Rees's total compensation for 2022 was $9,947,560.  Mehlman received a base salary of $623,693 and $1,185,160 in performance-based awards.  Mehlman's total compensation was $1,930,875 for 2022.  Thus, Defendants Rees and Mehlman were highly motivated to flood the market with excess HEYDUDE products because a majority of their compensation was based in large part on HEYDUDE's channel stuffing revenues.

124.     The Individual Defendants' scienter, which is attributable to the Company, is also demonstrated by their repeated discussion of HEYDUDE's revenue and growth, and wholesale customers' inventory in Crocs' earnings press releases, on earnings conference calls, and at investor conferences, both in their prepared remarks and in response to analysts' questions about the HEYDUDE business, as alleged in detail above.

125.     Further supporting a strong inference of scienter is HEYDUDE's role as one of the Company's core operations, accounting for a quarter of its revenue in 2022 and constituting one of Crocs' four reporting segments in its financial statements (along with three geographic segments for the legacy Crocs brand).

## VI.    LEAD PLAINTIFFS' CLASS-ACTION ALLEGATIONS

126.    Lead Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Crocs common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company ("Excluded D&Os"), Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors, and assigns, and any entity in which any of the foregoing have or had a controlling interest.

127.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Crocs' common stock was actively traded on the Nasdaq Global Select Market.  As of February 9, 2023, the Company had approximately 62 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Crocs or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares were held by hundreds, if not thousands, of individuals located geographically throughout the country.  Joinder would be highly impracticable.

128.    Common questions of law and fact predominate over questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated the Exchange Act as alleged in this Complaint;

(b)    Whether Defendants misrepresented or omitted material facts;

(c)    Whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)    Whether the prices of Crocs' common stock during the Class Period were artificially inflated because of Defendants' conduct alleged in this Complaint; and

(e)    Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

129.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in violation of the federal securities laws alleged in this Complaint.

130.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel who are competent and experienced in class action securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

131.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

132.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

133.    Lead Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

## VII.    PRESUMPTION OF RELIANCE

134.    Lead Plaintiffs and the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because the market for Crocs common stock was efficient at all relevant times by virtue of the following factors, among others:

(a)    as a registered issuer, the Company filed periodic public reports with the SEC;

(b)    the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)    the Company was covered by analysts from numerous brokerage firms and other Wall Street research firms, including Piper Sandler & Co.; Monness, Crespi, Hardt & Co.; Stifel, Nicolaus & Co.; UBS Investment Bank; Robert W. Baird & Co.; Loop Capital Markets LLC; Seaport Research Partners; Williams Trading, LLC; and Wedbush Securities Inc., whose reports were issued to these firms' clients and to the market.

135.    As a result of the foregoing, the market for Crocs' common stock promptly incorporated current information regarding the Company from publicly available sources and reflected that information in the prices of the Company's common stock.    Under these circumstances, all purchasers of Crocs' common stock during the Class Period suffered similar injury through their purchases of Crocs' common stock at artificially inflated prices, and a presumption of reliance applies.

136.    Lead Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against Defendants are predicated upon omissions of material facts that Defendants had a duty to disclose.

137.    Without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and other Class members purchased shares of Crocs common stock between the time when Defendants misrepresented, omitted, and failed to disclose material facts and the time when the true facts were disclosed.  Accordingly, Lead Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market.

## VIII.    NO SAFE HARBOR

138.    Defendants' "safe harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

139.    Defendants are liable for any false and misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be assumptions underlying or relating to any plan, projection, or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

140.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  The price of Crocs common stock significantly declined when the misrepresentations made to the market, the information alleged in this Complaint to have been concealed from the market, and the effects of that information were revealed, causing investors' losses.  As a result of their purchases of Crocs common stock during the Class Period,

Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

141.    Lead Plaintiffs incorporate the allegations in the preceding paragraphs by reference in this Count.

142.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and the other Class members; and (2) cause Lead Plaintiffs and the other Class members to purchase Crocs common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each Defendant took the actions alleged in this Complaint.

143.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Crocs common stock in an effort to maintain artificially high market prices of that stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

144.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant received copies of the Company's reports alleged in this Complaint to be misleading before, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information available to them, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations that they and the Company were making were then materially false and misleading.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

145.    Lead Plaintiffs incorporate the allegations in the preceding paragraphs by reference in this Count.

146.    The Individual Defendants acted as controlling persons of Crocs within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control – and did influence and control, directly or indirectly – the decision-making of the Company, including the content and dissemination of the various false and misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiffs to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

147.    As alleged in detail above, each Individual Defendant made many of the false and misleading statements alleged in this Complaint during earnings calls, at investor conferences, and in quotes included in Crocs' press releases.  In addition, Defendant Mehlman signed the Company's

Form 8-Ks and Form 10-Qs that included false and misleading statements, and Defendants Rees and Mehlman certified the accuracy and completeness of the Company's Form 10-Qs, and signed and certified the accuracy and completeness of the Company's Form 10-K that included false and misleading statements.  Thus, each Individual Defendant culpably participated in the Company's violations of Section 10(b) and Rule 10b-5.

148.    Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the activities giving rise to the securities violations by the Company as alleged in this Complaint, and exercised that power.

149.    As described above, the Company violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct alleged in this Complaint, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Crocs common stock during the Class Period.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a class action properly maintained under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants are liable under the Exchange Act;

C.    Awarding damages in favor of Lead Plaintiffs and the other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on that amount;

D.    Awarding Lead Plaintiffs and the other members of the Class their costs of suit, including reasonable attorney's fees and expenses and expert fees; and

E.    Directing such further relief as the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury.

Dated: December 15, 2025                    ROBBINS GELLER RUDMAN
                                                     & DOWD LLP


                                            _/s/ Christopher H. Lyons_
                                            Christopher H. Lyons (#5493)
                                            Tayler D. Bolton (#6640)
                                            1521 Concord Pike, Suite 301
                                            Wilmington, DE  19803
                                            Telephone:  (302) 467-2660
                                            clyons@rgrdlaw.com
                                            tbolton@rgrdlaw.com

                                            Chad Johnson*
                                            Noam Mandel*
                                            Desiree Cummings*
                                            Jonathan Zweig*
                                            420 Lexington Avenue, Suite 1832
                                            New York, NY 10170
                                            Telephone:  (212) 432-5100
                                            chadj@rgrdlaw.com
                                            noam@rgrdlaw.com
                                            dcummings@rgrdlaw.com
                                            jzweig@rgrdlaw.com

                                            *pro hac vice motion forthcoming*

                                            *Counsel for Lead Plaintiffs*

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

TEAMSTERS LOCAL 237 ADDITIONAL SECURITY BENEFIT FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Merritt v. Barclays PLC*, No. 2:23-cv-09217 (C.D. Cal.)
*Garbaccio v. Starbucks Corporation*, No. 2:24-cv-01362 (W.D. Wash.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of December, 2025.

TEAMSTERS LOCAL 237 ADDITIONAL
SECURITY BENEFIT FUND

By: _____
Diana Nappi, Director

CROCS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/25/2022 | 81 | $80.52 |
| 06/26/2024 | 900 | $151.68 |
| 06/27/2024 | 2,152 | $148.04 |

Prices listed are rounded to two decimal places.

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

TEAMSTERS LOCAL 237 SUPPLEMENTAL FUND FOR HOUSING AUTHORITY EMPLOYEES ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Merritt v. Barclays PLC*, No. 2:23-cv-09217 (C.D. Cal.)
*Garbaccio v. Starbucks Corporation*, No. 2:24-cv-01362 (W.D. Wash.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __ day of December, 2025.

TEAMSTERS LOCAL 237
SUPPLEMENTAL FUND FOR HOUSING
AUTHORITY EMPLOYEES

By: _____
      Diana Nappi, Director

CROCS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/25/2022 | 40 | $80.52 |
| 06/26/2024 | 500 | $151.68 |
| 06/27/2024 | 1,071 | $148.04 |

Prices listed are rounded to two decimal places.