**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MICHAEL ANTHONY CARRETTA, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>CROCS, INC., et al.,<br><br>    Defendants. | Case No. 1:25-cv-00096-JLH-EGT |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

OF COUNSEL:

**GIBSON, DUNN & CRUTCHER LLP**
Monica K. Loseman*
Allison Kostecka*
Holly Rooke*
1900 Lawrence Street, Suite 3000
Denver, CO 80202
Telephone: (303) 298-5700

Brian M. Lutz*
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200

*Admitted Pro Hac Vice*

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**

D. McKinley Measley (#5108)
Elizabeth A. Mullin Stoffer (#6380)
Jacob M. Perrone (#7250)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
(302) 658-9200

*Attorneys for Defendants*

Dated: February 27, 2026

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE & STAGE OF PROCEEDINGS ............................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................. 1

SUMMARY OF RELEVANT FACTUAL BACKGROUND ................................................ 3

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

   I.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5 ............................... 7

       A.   The Complaint Fails to Plead an Actionable Misstatement or Omission. .................... 7

          1.   The Complaint fails to specify the language that misled investors. .......................... 8

          2.   The Complaint lacks particularized facts indicating statements were false when made. ............................................................................................................................ 9

          3.   Forward-looking statements are not actionable. ..................................................... 12

          4.   Statements of opinion are not actionable. .............................................................. 14

          5.   Statements of corporate optimism are not actionable. ........................................... 15

       B.   The Complaint Fails to Plead Any Inference of Scienter. ......................................... 16

          1.   Plaintiffs do not plausibly allege any motive for the alleged fraud. ....................... 16

          2.   Rees' statements do not establish scienter. ............................................................ 17

          3.   Plaintiffs' core operations allegations do not establish scienter. ............................ 18

          4.   The competing, non-fraudulent inference is far more compelling. ......................... 19

       C.   The Complaint Fails to Plead Loss Causation. .......................................................... 20

   II.   Plaintiffs Fail to State a Claim Under Section 20(a) ..................................................... 20

CONCLUSION ................................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)...................................................................................10

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010)..............................................................................12, 13

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013)......................................................................11

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)................................................................................10

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)...........................................................................6, 7, 20

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) .................................................................................14

*Dang v. Amarin Corp. plc*,
  750 F. Supp. 3d 431 (D.N.J. 2024) ..................................................................17, 19

*Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)....................................................................................7

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa. 2018), *aff'd sub nom. Spizzirri v. Zyla Life
  Scis.*, 802 Fed. Appx. 738 (3d Cir. 2020) ...............................................................3

*In re Focus Fin. Partners*,
  2025 WL 961488 (D. Del. Mar. 31, 2025) ............................................................14

*Garfield v. Shutterfly, Inc.*,
  2021 WL 2026854 (3d Cir. May 21, 2021) ......................................................13, 14

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)...................................................................................17

*Handal v. Innovative Indus. Props., Inc.*,
  157 F.4th 279 (3d Cir. 2025) ...............................................................7, 16, 17, 20

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018)...................................................................................18

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).............................................................................16, 17

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ............................................................................................... 8

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) ............................................................................................... 7

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ............................................................................... 20

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997) ................................................................................. 9

*In re NAHC, Inc. Secs. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ................................................................... 2, 3, 11

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) ......................................................................... 12, 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..................................................................................... 14, 15

*In re Plug Power Inc.*,
    2025 WL 388705 (D. Del. Feb. 4, 2025) ............................................................ 8, 9

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ......................................................................... 18, 19

*Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*,
    113 F.3d 405 (3d Cir. 1997) ................................................................................. 9

*Schwartz v. Perseon Corp.*,
    175 F. Supp. 3d 390 (D. Del. 2016) ....................................................... 10, 11, 16

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17,
    2022) .......................................................................................................... 10, 12, 20

*Smith v. Antares Pharma, Inc.*,
    2019 WL 2785600 (D.N.J. July 2, 2019) ............................................................ 8, 9

*Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*,
    775 F. Supp. 3d 826, 850 (D.N.J. 2025) ........................................................ 18, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 7, 16, 19

*In re Walmart Inc. Sec. Litig.*,
    151 F.4th 103 (3d Cir. 2025) ........................................................................... 7, 11

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ................................................................................. 7

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

### Statutes

15 U.S.C. § 78u-4(b)(1) ..................................................................................................7

15 U.S.C. § 78u-4(b)(2)(A)............................................................................................7

15 U.S.C. § 78u-5(i)(1)(A)–(D)....................................................................................12

### Rules

Fed. R. Evid. 201(b)(1)–(2) ..........................................................................................3

iii

## NATURE & STAGE OF PROCEEDINGS

This putative securities class action was filed on January 22, 2025. D.I.1. On October 15, 2025, the Court appointed Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees as Lead Plaintiffs ("Plaintiffs"). D.I.39. On December 15, 2025, Plaintiffs filed the Amended Complaint for Violations of the Federal Securities Laws, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against Andrew Rees, Anne Mehlman, and Crocs, Inc. ("Defendants"), and violations of Section 20(a) of the Exchange Act against Rees and Mehlman. D.I.41 (the "Complaint" or ¶__). Defendants move to dismiss the Complaint under Rule 12(b)(6).

## SUMMARY OF ARGUMENT

Plaintiffs' Complaint is a textbook example of pleading securities fraud by hindsight. Crocs acquired HEYDUDE, another footwear brand, in early 2022. Shortly after the acquisition, HEYDUDE performed exceptionally well, driven by strong consumer demand, and exceeded Crocs' initial expectations. To meet that strong initial demand, Crocs deliberately and transparently expanded its wholesale distribution network to fill that "pipeline" and scale the brand. Only after demand later decreased do Plaintiffs attempt to recast Crocs' business decisions as securities fraud, alleging—without particularized facts—that Crocs should have predicted future results and disclosed unspecified risks about wholesale inventory dynamics. But Crocs told its investors about the wholesale strategy and the pipeline fill, and disclosed the risks related to its strategy, including that growth may slow and that it may not accurately forecast future demand. The securities laws do not demand clairvoyance: Crocs' inability to predict the future is not securities fraud. The Complaint fails to allege a false or misleading statement, much less a knowing one, and should be dismissed for at least three reasons.

1.      **The Complaint fails to adequately allege a material misstatement.** The

1

Complaint suffers from a glaring deficiency. The Private Securities Litigation Reform Act of 1995 (the "PSLRA") demands that securities fraud complaints "specify" both the statements alleged to be false or misleading and why those statements were false or misleading when made. Plaintiffs fail on both fronts. Not only does the Complaint contain a myriad of partial quotes and block quotes with no indication of *what* is being challenged, the Complaint is devoid of alleged facts explaining *why or how* any statement was false or misleading when made. This alone is grounds for dismissal.

More generally, the Complaint fails to allege an actionable false or misleading statement. Plaintiffs do not allege that HEYDUDE's financial results or statements regarding wholesale demand, sales, and inventory cleanup were incorrect when made. Instead, the Complaint repeats a series of general conclusions alleging that "quoted" statements in the Complaint were misleading because, in hindsight, Crocs' wholesale distribution strategy and inventory cleanup efforts did not go according to plan. But "liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Secs. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Not to mention, most of the statements Plaintiffs challenge are inactionable forward-looking statements, opinions, or puffery.

2.     **The Complaint fails to adequately allege scienter.** To survive a motion to dismiss, the PSLRA requires plaintiffs to plead particularized facts supporting a strong inference that each defendant acted with intent to defraud or severe recklessness. The Complaint falls short—lacking any factual allegations indicating *what* any Defendant knew, *when* they knew it, and *how* it rendered any statement false when made. Without allegations of contemporaneous, contradictory information, Plaintiffs resort to routinely rejected scienter allegations: hindsight, executive compensation, and "core operations." Here, the more-plausible inference drawn from the facts alleged is innocent: Crocs pursued and disclosed a wholesale-expansion strategy for HEYDUDE and then did what prudent managers do and adjusted course as the situation changed.

3.  **The Complaint fails to adequately allege loss causation.** Plaintiffs attempt to convert a series of earnings announcements and guidance updates into "partial disclosures" of fraud. But a stock drop following disappointing financial results does not establish loss causation and, according to Plaintiffs' own allegations, Crocs discussed its wholesale strategy and the pipeline fill throughout the putative class period. The alleged stock price declines track changing expectations and performance, not newly revealed "truth" that prior statements were fraudulent.

Stripped of rhetoric, Plaintiffs allege only that Crocs' strategy did not unfold as it hoped. That is not fraud. The Complaint should be dismissed in its entirety and with prejudice.

## SUMMARY OF RELEVANT FACTUAL BACKGROUND[1]

Crocs is a footwear company that sells products under the Crocs and HEYDUDE brands. ¶16. Crocs acquired HEYDUDE in February 2022, describing it as a rapidly growing brand that had the potential to be "a $1 billion brand by 2024." ¶17. Crocs' early optimism for the HEYDUDE brand proved accurate. In just the first few months of Crocs' ownership, HEYDUDE "exceeded expectations." ¶21. While Crocs repeatedly warned investors that it was too early to "outline the longer-term potential" for HEYDUDE, *e.g.*, ¶¶21, 29, it disclosed seeing strong "consumer love" or demand for this "hot[]" brand. ¶21; *see also* Ex. 3 at 4, 8 (discussing impressive consumer advocacy and positive, early wholesale "sell-through" to end-use customers).[2]

---

[1] Defendants request that the Court take judicial notice or incorporate by reference documents that are "integral to or explicitly relied upon in the complaint." *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 497 (E.D. Pa. 2018), *aff'd sub nom. Spizzirri v. Zyla Life Scis.*, 802 Fed. Appx. 738 (3d Cir. 2020); *see also* Fed. R. Evid. 201(b)(1)–(2); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (approving of lower court's decision taking judicial notice of 32 SEC filings and press releases referenced in the complaint, seven SEC filings not relied upon in the complaint, and publicly available stock price data). Defendants request that the Court take judicial notice or incorporate by reference Crocs' exhibits 1, through 31, which are appended to the Declaration of Jacob M. Perrone. Each of these exhibits are referenced within the Complaint and publicly available documents not subject to reasonable dispute.

[2] Like Crocs-brand footwear, Crocs sells HEYDUDE footwear through two channels in the United States: direct-to-consumer ("DTC") and wholesale. *See* ¶2. Wholesale channels include national

3

To meet this demand, Crocs disclosed that it was "investing rapidly" in capabilities to "sustain the growth potential" of HEYDUDE, which included expanding wholesale distribution both by adding new retail partners and increasing shelf space with current retail partners. *See* ¶¶29, 30–32; Ex. 5 at 3, 10, 14. Crocs explained it took these steps based on "receptivity" from major wholesalers, ¶30, and major wholesale partners' strong "sell-through," ¶31. HEYDUDE's revenue for 2Q22 was $232.4 million, a 96% increase from 2Q21. ¶23. Investors were aware that the 2022 revenue figures were based, in part, on expanding and filling the wholesale pipeline, and would not be repeated. In fact, when asked in August 2022 whether the explosive growth the Company was seeing was due to "filling that [expanded wholesale] pipeline" with HEYDUDE product, Rees explicitly stated, "Yes." Ex. 5 at 18.

Investors were also aware of the acquisition and go-forward business risks. Crocs warned investors that the acquisition posed various risks, including that sales may not meet expectations:

> ***Our ability to realize the benefits from the Acquisition is substantially dependent on our ability to continue to grow HEYDUDE.*** *Combining with Crocs, Inc. may not accelerate the growth and success of HEYDUDE, and the HEYDUDE business may not perform as expected.* ***If we are unsuccessful at, among other things, building HEYDUDE's brand awareness,*** *enhancing its digital capabilities,* ***leveraging our wholesale relationships to enhance distribution,*** *investing in HEYDUDE's infrastructure as well as sales and business operations,* ***leveraging our distribution for global growth and/or investing to scale our supply chain and gain efficiencies, our sales could be adversely affected, and our business could suffer. In addition, HEYDUDE's product sales may not meet our expectations.***

Ex. 11 at 26 (emphasis added). Crocs also made clear the risks associated with its overall business. Crocs warned investors that it operated in a "very competitive and rapidly changing environment." *Id.* at 9. It noted risks to the business included its "inability to accurately forecast consumer

---

and regional retailers. ¶¶2, 32. HEYDUDE sells product to these retailers ("sell in"), who, in turn, sell products to end-use customers ("sell-out" or "sell-through"). ¶¶76, 80. When a brand expands to new retailers, the company must ship inventory to stock shelves, which can be described as "pipeline fill." ¶¶32, 61.

demand" and an "inability to successfully execute our long-term growth strategy, maintain or grow our current revenue and profit levels, or accurately forecast demand and supply for our products." *Id.* at i–ii. Indeed, Crocs was clear and unequivocal in explaining the risk:

> *If we do not accurately forecast consumer demand, we may have excess inventory to liquidate or have greater difficulty filling our customers' orders, either of which could adversely affect our business. **The footwear industry is subject to** cyclical variations, consolidation, contraction and closings, as well as **fashion trends, rapid changes in consumer preferences**, the effects of weather, general economic conditions, and other factors affecting consumer demand. **In addition, purchase orders from our wholesale customers are generally subject to rights of cancellation and rescheduling by the wholesaler. These factors make it difficult to forecast consumer demand. If we overestimate demand for our products, we may be forced to liquidate excess inventories at discounted prices resulting in losses or lower gross margins.** Conversely, if we underestimate consumer demand, we could have inventory shortages, which can result in lower sales, delays in shipments to customers, and expedited shipping costs, and adversely affect our relationships with our customers and diminish brand loyalty. Excess inventory, or any failure on our part to satisfy increased demand for our products, could adversely affect our business and financial results.*

*Id.* at 15 (emphasis added).

Throughout 2022 and into 2023, Crocs continued to see "strong [wholesale] sell-throughs," suggesting continuing consumer demand. ¶41. It, therefore, continued to scale wholesale distribution of the brand, including by shipping more products to wholesalers to increase "shelf presence" and ward off competition. *See* ¶¶40, 45. Crocs projected that HEYDUDE revenue would continue to grow in 2023, ¶43, Ex. 12 at 3; Ex. 13 at 5–7, 21, while also expressing caution that this growth might slow throughout the year. *Id.* at 9, 17–18.

As warned, growth did slow in 2023, and Rees reminded investors that some slowdown was expected because HEYDUDE would not repeat the sales volume from "pipeline fills" to open "big national accounts" and initially stock "400, 500, 600 doors," as it had in 2022. ¶¶61, 66. Crocs even quantified the 2022 pipeline fill, explaining it made a "conscious decision" to "secure [] shelf space" amid competitive conditions, ¶¶66, 68. In late 2023, amid shifting market conditions and

with the benefit of additional wholesale data, Crocs disclosed that its rapid wholesale expansion strategy "didn't play out as [Crocs] thought it would." Ex. 24 at 8; *see also, e.g.*, ¶¶75–77, 85, 87, 91–92, 99. In hindsight, Crocs' strategy to fill the wholesale pipeline "to capture the shelf space" and "raise[] brand awareness," Ex. 21 at 11–12, had resulted in "too many [wholesale] accounts, with too much inventory, kind of competing against each other," Ex. 24 at 9. HEYDUDE's revenue growth was also impacted by macroeconomic factors and wholesalers' shift to a more conservative market outlook. *See* ¶86; Ex. 21 at 5. In 3Q23, Crocs launched efforts to "clean-up" wholesale inventory and disclosed those efforts to investors. ¶¶85, 91, 92, 97, 105.

Despite "progress in improving the health of [HEYDUDE] North America," in 2024, business remained "challenging" for HEYDUDE and Crocs disclosed that it expected challenges "to continue." ¶¶107, 111; Ex. 29 at 3–4. On October 29, 2024, Crocs explained: "HEYDUDE's recent performance and the current operating environment are signaling it will take longer than we initially planned for the business to turn the corner." Ex. 31 at 5. On this call, management also explained that, after the acquisition, the brand "grew too fast," and early stock-outs (wholesalers selling out of inventory) in the "'22 into '23 time frame" led the Company to ship product that "in retrospect" was "too much." ¶117; Ex. 31 at 16. Crocs' stock price dropped on October 29, 2024, ¶119, and this lawsuit followed.

As alleged, Crocs' disclosures reflect an unremarkable post-acquisition arc: Crocs acquired a "hot" brand and available data supported rapid expansion. Crocs explained its business strategy post-acquisition and disclosed in detail the associated risks. The Company later confronted slower wholesale orders as demand shifted. That is not fraud; it's just business.

## LEGAL STANDARD

As this Court well knows, securities fraud plaintiffs are required to meet heightened and formidable pleading requirements. *E.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126,

6

145 (3d Cir. 2004); *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 292–93 (3d Cir. 2025). To state a claim under Section 10(b), a plaintiff must satisfy both the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240–41 (3d Cir. 2017). Rule 9(b) requires that plaintiffs plead particularized allegations of the circumstances constituting fraud. *In re Walmart Inc. Sec. Litig.*, 151 F.4th 103, 112 (3d Cir. 2025). The PSLRA elevates this pleading requirement even further, requiring plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and to state "with particularity facts giving rise to a strong inference that the defendant acted with" scienter or the intent to deceive, 15 U.S.C. § 78u-4(b)(2)(A). If a complaint does not satisfy these "exacting pleading requirements," it must be dismissed. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

## ARGUMENT

### I.      Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5

To state a Section 10(b) claim, the complaint must allege: (1) a material misrepresentation or omission (falsity); (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which plaintiffs relied; (5) economic loss; and (6) loss causation. *Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Failure to adequately allege any one of these elements is fatal at the pleading stage. *Cal. Pub. Emps.'*, 394 F.3d at 145. Plaintiffs fail to adequately allege at least three elements.

### A.      The Complaint Fails to Plead an Actionable Misstatement or Omission.

To plead falsity, a plaintiff must allege that each defendant made an affirmative misstatement or a statement that omitted necessary facts. While "pure omissions are not actionable," falsity can be alleged if a defendant made a "half-truth" that "omit[ed] critical qualifying information." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257,

7

263–66 (2024). Although difficult to identify (*see infra* at Section I.A.1), the Complaint appears to challenge "quoted" statements in 55 paragraphs. To allege falsity, the PSLRA demands far more specificity than the Complaint provides. Moreover, most of the "quoted" statements in the Complaint are inactionable as a matter of law.[3]

### 1.    The Complaint fails to specify the language that misled investors.

"[N]either the defendants nor the court can address [Rule 10b-5] allegations" unless "plaintiffs specifically identify the statements on which they would like to proceed and the reasons why these statements are false or misleading." *In re Plug Power Inc.*, 2025 WL 388705, at *2 (D. Del. Feb. 4, 2025) ("[T]he Court has no practical ability to [assess falsity] until Plaintiffs precisely identify which statements are at issue."). Here, rather than *specify* the statements that were purportedly false or misleading as the PSLRA demands, Plaintiffs devote over 28 pages of the Complaint—totaling 90 paragraphs—to a recitation of allegedly false and misleading statements. This section consists of long block quotes or random snippets of quotes—taken out of context and often lumping different speakers and topics together to create a misleading impression.[4] Plaintiffs make no effort to pinpoint what is false or misleading. Courts regularly dismiss complaints that require defendants and the court "to guess which portion, or portions, of the lengthy statements Plaintiff[s] believe[d] to be actionable,"—that result is warranted here. *Smith v. Antares Pharma, Inc.*, 2019 WL 2785600, at *10 (D.N.J. July 2, 2019); *Plug Power*, 2025 WL 388705, at *2.

---

[3] Plaintiffs appear to challenge statements by nonparties, including analysts. Plaintiffs do not allege Defendants had ultimate authority over these statements, and Defendants cannot be liable for them. *See, e.g.*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The statements challenged in ¶¶31, 32, 40, 55, 62, 80, 110, therefore, should be dismissed.

[4] For example, paragraph 75 lumps together disparate materials—a July 27, 2023 press-release statement, Mehlman's separate earnings-call commentary, and multiple Rees quotations—into one curated narrative that reads like a single, coherent admission. By failing to acknowledge the surrounding Q&A, sequencing, and timing for each statement, it strips away context and leaves Defendants without fair notice of what, precisely, is being challenged.

In addition to failing to specify *what* statements are challenged, the Complaint fails to allege facts indicating *why* each challenged statement was false or misleading when made. Instead, the Complaint periodically recites generalized conclusions to explain why unspecified "quoted" language in multiple preceding paragraphs was false. *See* ¶¶28, 34, 39, 42, 44, 46, 50, 54, 59, 65, 74, 81, 94, 96, 98, 100, 106, 113. These "why false" allegations contain no facts explaining why the statement is allegedly misleading. Nor do they connect to any challenged language. To survive this motion, more is required. *See, e.g.*, *Plug Power*, 2025 WL 388705, at *2 ("It is not the Court's job to parse through [the allegations] … to try to figure out what evidence might plausibly support falsity"); *Smith*, 2019 WL 2785600, at *11 (the "pleading fails because Plaintiff does not relate Defendants' statements to specific reasons why the statements were false or misleading").

For example, in paragraphs 29–33, Plaintiffs liberally quote nearly 500 words pulled from different parts of an earnings call, purporting to challenge disparate statements about management, investing in capabilities, the inability to "outline the longer-term potential" of HEYDUDE, and following a "playbook," as well as discussions of wholesale partner receptivity, distribution expansion, and inventory management. In paragraph 34, Plaintiffs declare the quoted excerpts "materially false and misleading" because Defendants allegedly "were aware" that the Company was delivering "excess product to Crocs' wholesale customers" and that the reported growth levels were "unsustainable" in the future. The Court should reject these "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), as they do not show the quoted statements were false when made.

> **2.  The Complaint lacks particularized facts indicating statements were false when made.**

While Plaintiffs challenge statements regarding HEYDUDE's revenue and wholesale

channel health during the putative class period, *see* ¶¶23, 25–27, 35–38, 51–53, 60, 67, 75, 85, 87, 95, 103, 107, they never allege that these statements were incorrect, *see* ¶¶28, 34, 39, 42, 44, 46, 50, 54, 59, 65, 74, 81, 94, 96, 98, 100, 106, 113.[5] Instead, Plaintiffs allege that Defendants engaged in "channel stuffing" by delivering "excess merchandise into its wholesale channels" to inflate HEYDUDE's 2022 revenue. *E.g.*, ¶¶28, 34, 39, 44, 50, 54, 96. But the Complaint fails to allege facts to support this theory. There are no allegations of contemporaneous reports or witness accounts indicating the pipeline fill far exceeded anticipated demand. *See Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 401 (D. Del. 2016) (finding a dearth of contemporaneous facts or explanation insufficient to turn a conclusory narrative into a plausible claim). Plaintiffs rely solely on later statements that Crocs had shipped inventory to prevent competition and that it had, in retrospect, shipped too much inventory into the wholesale channel. ¶¶68, 69, 85, 117. These statements say nothing about whether any challenged statement was false **when made**. Plaintiffs allege only fraud by hindsight, which "has been long rejected, as a matter of law, as a basis for liability." *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 60 (D. Del. 2020), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022) (cleaned up).

Plaintiffs also purport to challenge statements in 2023 and 2024 regarding Crocs' efforts to "clean up" wholesale inventory, claiming the clean-up required was "more extensive than disclosed" and Crocs' efforts were inadequate. ¶¶94, 98, 100, 106, 113. But, again, Plaintiffs do not allege any facts to support this theory of falsity; rather, they simply state that Defendants must have known they were "not succeeding" or "not successful" because additional efforts were later

---

[5] Plaintiffs cannot frame accurate reporting as misleading. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("[W]ell settled is the principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").

necessary. *See id.* Once more, Plaintiffs' theory rests entirely on hindsight. "To be actionable, a statement or omission must have been misleading ***at the time it was made***; liability cannot be imposed on the basis of subsequent events." *NAHC*, 306 F.3d at 1330 (emphasis added).

The Complaint also relies heavily on an omission-based theory of fraud, alleging Crocs' statements regarding HEYDUDE's revenue and early success were misleading because Crocs did not disclose the wholesale pipeline fill in 2022. *See, e.g.*, ¶28. At the outset, this theory fails because Crocs' wholesale expansion strategy, and the corresponding impact of filling that pipeline, was disclosed to investors. *E.g.*, ¶29; Ex. 5 at 18 (affirming analyst inquiry of growth due to "filling that pipeline"). When "alleged omissions are contradicted by the company's public disclosures … there can be no Section 10(b) claim." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013). Regardless, to state an omission-based claim, Plaintiffs must identify an affirmative statement rendered misleading "in the light of the circumstances under which it was made." *Walmart Inc. Sec. Litig.*, 151 F.4th at 113 (cleaned up). Plaintiffs fail to do so.

In evaluating whether a statement is misleading, "the Complaint [is] not considered in a vacuum" and "courts review the allegedly fraudulent statements or omissions in light of all of the company's disclosures and the entirety of market information." *Schwartz*, 175 F. Supp. 3d at 400. Here, statements regarding HEYDUDE's revenue and optimism regarding the brand's potential were accompanied by statements discussing Crocs' strategy to expand and fill the wholesale pipeline, *e.g.*, ¶¶30, 32, 40, statements regarding strong consumer demand and receptivity by wholesalers, *e.g.*, ¶¶ 29, 31, 41, and statements warning investors that "the HEYDUDE business may not perform as expected … [and] HEYDUDE's product sales may not meet our expectations," Ex. 11 at 26. Investors, therefore, were aware of Crocs' strategy to expand the wholesale pipeline, its reasons for doing so, and the risks inherent to that strategy. Courts routinely dismiss allegations

where, as here, the allegedly concealed information was a part of the broader mix of information available to investors. *SLF Holdings*, 499 F. Supp. 3d at 65–66 (reviewing publicly available documents which "put [] shareholders and [plaintiffs] on notice" of allegedly undisclosed risks and finding the related challenged statements inactionable).

Crocs never represented to investors that the revenue obtained from initially filling the wholesale pipeline would be repeated in future years. *See* ¶61. And Plaintiffs lack factual allegations indicating Defendants knew the ***disclosed revenue*** somehow meant their ***projected future revenue*** could not be met. Aware of the pipeline fill, Crocs still ***projected*** HEYDUDE wholesale revenue to increase—there are no facts alleged to render that projection misleading.

The Complaint fails to allege specific facts indicating why each statement Plaintiffs purport to challenge was false or misleading when made, which warrants dismissal of the entire Complaint.

### 3.    Forward-looking statements are not actionable.

Many of the challenged statements are inactionable forward-looking statements. The PSLRA immunizes forward-looking statements that are (1) accompanied by meaningful cautionary statements, ***or*** (2) immaterial, ***or*** (3) not made with actual knowledge of falsity. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010).

Under the PSLRA, forward-looking statements include projections, plans, and objectives, or assumptions underlying or relating to projections, plans, or future economic performance. 15 U.S.C. § 78u-5(i)(1)(A)–(D); *Aetna, Inc. Sec. Litig.*, 617 F.3d at 279. Words such as "expect[]" and similar predictive phrasing are indicative of a forward-looking statement. *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 501 (3d Cir. 2016). Here, many of the challenged "quoted" statements are classically forward-looking as they concern expected performance and guidance for the HEYDUDE brand and future financial outlook, *e.g.*, ¶¶24–27, 36–38, 43 ("[W]e expect a long trajectory of growth opportunities within HEYDUDE[.]"), 52, 53, 55, 57, 64, 95, 110, as well as

statements describing the Company's plans and objectives regarding wholesale strategy and inventory management, *e.g.*, ¶¶29, 48, 57, 64, 69, 75, 91, 97, and 104.

Forward-looking statements that are accompanied by cautionary language are protected by the safe harbor. *Aetna, Inc. Sec. Litig.*, 617 F.3d at 282; *Garfield v. Shutterfly, Inc.*, 2021 WL 2026854, at *78 (3d Cir. May 21, 2021). Here, the Complaint does not even allege that any challenged, forward-looking statement was not accompanied by meaningful cautionary language. ¶¶138–39. Nor could it. The quoted forward-looking statements were made on earnings calls, in earnings press releases, and at conferences. In each of these contexts, Crocs cautioned investors that information provided could be forward-looking and directed investors to "reports filed with the SEC for more information on [] risks and uncertainties." *E.g.*, Ex. 29 at 2; 12 at 3; 17 at 2.

Crocs' SEC filings further warned investors that forward-looking "expectations regarding leveraging our global presence, innovative marketing, and scale infrastructure to grow HEYDUDE and to create significant shareholder value" were subject to the risks at issue here, including "the significant competition that we face;" "our inability to accurately forecast consumer demand;" "our inability to successfully execute our long-term growth strategy, maintain or grow our current revenue and profit levels, or accurately forecast demand and supply for our products;" and "our ability to realize the benefits from the Acquisition [of HEYDUDE]." *E.g.*, Ex. 11 at i–ii, 26–27; *see also, e.g.*, 4 at 3 (disclosing risks, including "our ability to accurately forecast consumer demand for our products; our ability to successfully implement our strategic plans."). Such "warnings and disclaimers[,] [which] directly address the substance of the statement the plaintiffs challenge[,] [] render the alleged misrepresentation immaterial." *Garfield*, 2021 WL 2026854, at

13

*79 (internal citations omitted).[6] The statements in paragraphs 24–27, 29–33, 36–38, 40–41,43, 47–49, 52–53, 55, 57, 61, 64, 66, 69, 75–77, 85, 91–92, 95, 97, 103–04, 107, and 110 should be dismissed as forward-looking and protected by the safe harbor.

### 4.   Statements of opinion are not actionable.

The Complaint also challenges opinions. Section 10(b) prohibits "untrue statement[s] of fact," which "expresses certainty about a thing," rather than opinions, which do not. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). An opinion is only actionable if it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). These are narrow pathways for liability, and Plaintiffs do not satisfy them.

Many of the quoted statements are quintessential opinions, couched in verbiage like "I think," "I would say," "we believe," "we feel," "we are excited," and "we're [] confident." *See, e.g.*, ¶¶ 27, 29, 30–32, 41, 55, 64, 68, 99, 105. Plaintiffs do not allege that either Rees or Mehlman did not sincerely hold these opinions, nor that their opinions had no reasonable basis. Instead, Plaintiffs attempt to treat later developments as proof that earlier judgments must have been fraudulent. That is not a well-pled theory of subjective disbelief. *See In re Focus Fin. Partners*, 2025 WL 961488, at *6 (D. Del. Mar. 31, 2025) ("Plaintiffs do not argue that this statement was 'not sincerely believed' **when made**.") (emphasis added) (internal citations omitted).

Plaintiffs similarly fail to plead "embedded factual falsity." Even where an opinion

---

[6] Plaintiffs' claims also fail because the Complaint does not plead actual knowledge of falsity. *See, e.g.*, *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) ("Even in the absence of such meaningful cautionary language, the second entrance to the safe harbor is available to 'immunize[ ] from liability any forward looking statement [if] ... the plaintiff fails to show the statement was made with actual knowledge of its falsehood.'"); *see also supra* at Section I.B.

14

arguably includes an objective component, the Complaint lacks factual allegations indicating that the objective component was wrong. For instance, paragraph 105 states "we're pleased with the work we have done to clean up our account base … [and] [w]e feel really good about inventory. We think that's the right level because we're at kind of 4x turns…" The Complaint lacks alleged facts indicating the "4x turns" was false, they simply disagree with the optimistic assessment given the benefit of hindsight, which is not sufficient to sustain a claim of securities fraud.

Finally, it "is no small task for an investor" to allege with specificity that a defendant omitted a material fact that rendered the opinion misleading. *Omnicare*, 575 U.S. at 194. Not once does the Complaint allege that, at the time any challenged statement was made, Defendants knew, but failed to disclose, a fact that undercut his or her opinion. For example, the Complaint targets Rees' assessment that strategic accounts' sellout "were up 28%" and that "we think [it] will continue to grow." ¶91. But Plaintiffs fail to plead any facts that would render these opinions misleading, relying instead on the conclusory assertion that Crocs was "obscur[ing] the extent and ramifications" of alleged "channel stuffing" and that the inventory cleanup was "more extensive than disclosed." ¶94. This is inadequate under *Omnicare*. The statements quoted in paragraphs 27, 29–32, 35, 37–38, 40–41, 43, 45, 47, 49, 52–53, 55, 58, 61, 64, 66, 68–69, 72, 76–77, 80, 85–87, 91, 97, 99, 104–05, and 111 are not actionable opinions and should be dismissed.

### 5.    Statements of corporate optimism are not actionable.

Plaintiffs also purport to challenge statements that are inactionable puffery or statements of corporate optimism. Plaintiffs, for example, quote statements that "consumer demand … is exceptional," that management remained "incredibly confident" in "best-in-class profitability," that wholesale partners showed "exuberant enthusiasm," that brand performance was "really stunning," or that there was "lots of runway" ahead. *See, e.g.*, ¶¶24, 30, 32, 49, 55, 64. But "[s]uch non-specific statements of optimism or hope that a trend will continue … have been almost

15

uniformly rejected by the courts … [as] puffery, ... and are too vague to be actionable[.]" *Schwartz*, 175 F. Supp. 3d at 402 (cleaned up). Accordingly, the quoted statements of corporate optimism in paragraphs 24, 26–27, 29–33, 35, 37–38, 40–41, 43, 45, 47–49, 52–53, 55, 58, 64, 66, 68, 72, 76, 80, 85–87, 91–92, 97, 99, 104–05, 107, and 111 are not actionable and should be dismissed.

### B.    The Complaint Fails to Plead Any Inference of Scienter.

To plead scienter, the Complaint must allege particular facts giving rise to a "strong inference" that **each defendant** made **each false or misleading statement** intentionally or with recklessness akin to "willful ignorance." *Handal*, 157 F.4th at 301–03. The inference of scienter must be more than "'reasonable' or 'permissible,'" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

The allegations in the Complaint fall short of this standard. Plaintiffs' scienter allegations boil down to bare assertions that Defendants must have known their statements were misleading because the HEYDUDE brand was important to Crocs and Crocs later disclosed a shift in its wholesale strategy for that brand. Plaintiffs allege no plausible motive for the alleged deceit and make no effort to address each Defendant's state of mind, nor do they cite any contemporaneous witness accounts or internal documents that suggest any statement was intentionally false or misleading when made. At bottom, the Complaint fails to allege **any** inference of scienter, much less a cogent and compelling inference that outweighs non-fraudulent explanations.

### 1.    Plaintiffs do not plausibly allege any motive for the alleged fraud.

The Complaint lacks allegations indicating Defendants had any motive to commit fraud. To support an inference of scienter, motive allegations must show that the defendant benefitted from the alleged fraud in some concrete and personal way. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 278–79 (3d Cir. 2009). General motives and routine financial incentives common to all executives do not "give rise to a 'strong inference' of fraudulent intent." *GSC Partners CDO*

16

*Fund v. Washington*, 368 F.3d 228, 237–38 (3d Cir. 2004); *see also Avaya, Inc.*, 564 F.3d at 279.

Plaintiffs allege that Rees and Mehlman had motive to commit fraud because part of their compensation was contingent on Crocs' hitting various targets and metrics, some of which take revenue into account. ¶122. Not only is routine executive compensation uniformly rejected as giving rise to a strong inference of scienter, *GSC Partners*, 368 F.3d at 237–38, but also Plaintiffs' theory falls apart on their own allegations. The Complaint alleges that Rees and Mehlman must have been "incentivized" to inflate HEYDUDE's revenue to increase their incentive-based compensation in 2022 but admit that HEYDUDE revenue was just one of many inputs in just two of four performance-based metrics. ¶122. Moreover, the Complaint lacks allegations indicating 2022 revenue for HEYDUDE (or Crocs) was inaccurate in any way. In other words, Plaintiffs do not allege that Rees and Mehlman even benefited from the alleged fraud—they would have earned their compensation whether the alleged omissions were disclosed or not. These allegations are plainly insufficient to give rise to any inference of scienter.

### 2. Rees' statements do not establish scienter.

The Complaint alleges that the Defendants' own statements regarding "monitor[ing] inventory levels of HEYDUDE products held by Crocs' large wholesale customers" gives rise to an inference of scienter. ¶121. But simply knowing or speaking about a topic is insufficient to establish scienter under the PSLRA. *Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 476 (D.N.J. 2024). Instead, a plaintiff must plead "specific facts" showing that speakers were either willfully ignorant or ***knew*** facts that would have obviously made their statements false. *Handal*, 157 F.4th at 303–04. Plaintiffs do not allege that information provided by these "large wholesale customers" contradicted Defendants' public statements regarding the HEYDUDE wholesale strategy.

Plaintiffs also ask the Court to infer that all Defendants acted with an intent to deceive based on Rees' statements in early 2023, which indicated that the "pipeline" fill was a "conscious

17

decision" and acknowledged that Crocs "could have done a better job being a little [more] clear about" the pipeline fill and "didn't do a good enough job explaining" the resulting "bumps." ¶120. These statements are not indicative of scienter. As discussed above, Crocs repeatedly disclosed its strategy to expand wholesale distribution and increase wholesale shelf-space. *See supra* at Section I.A.2. It also disclosed increased revenue from initial "pipeline" fill. *See* ¶66; Ex. 5 at 18. When market conditions started to shift, and wholesale demand started to dip, Crocs shifted strategies but disclosed the impact of its prior effort to fill the wholesale pipeline. *E.g.*, ¶¶76–77 At most, these later-made statements acknowledge that the Company thought its prior statements were clear, but if not, any uncertainty was unintentional. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) (purported "admissions are more plausibly interpreted as admissions of mismanagement, not of affirmative misconduct on the part of the Individual Defendants").

### 3.    Plaintiffs' core operations allegations do not establish scienter.

Plaintiffs attempt to allege scienter based on a cursory allegation regarding "HEYDUDE's role as one of the Company's core operations." ¶125. The core operations theory of scienter relies on the principle that alleged "misrepresentations and omissions involv[ing] core matters of central importance" may create "a core operations inference." *Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*, 775 F. Supp. 3d 826, 850 (D.N.J. 2025) (cleaned up). But the path to this inference is narrow, as "'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter'" instead "there ***must*** be 'some additional allegations of specific information conveyed to management and related to fraud.'" *Id.* (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) (emphasis added)). Here, the Complaint falls far short of alleging scienter under the core operations theory.

The Complaint contains no particularized allegations that demonstrate Defendants had access to information that contradicted any challenged statement. Plaintiffs do not identify any

particular report, analysis, or communication that was provided to any Defendant, when it was provided, what it said, or how it contradicted any challenged statement when made. Plaintiffs assert that Rees stated that the Company received "weekly tracking information on sellouts and inventory on hand and terms" for major U.S. wholesale accounts, which provided "a lot of visibility and transparency." ¶121. But the Complaint never pleads what this "weekly tracking" report showed, when any purportedly adverse trend appeared, if that trend would apply to other wholesale accounts, if any Defendant received or reviewed the information, or how it made any statement false at the time it was made. Plaintiffs' failure to allege "defendants [] specifically received information related to the alleged [omissions] and nonetheless omitted that information in their statements," renders their core operations argument meritless. *Stichting*, 775 F. Supp. 3d at 850.

Moreover, the fact that a business line is important, or even contributes to a significant portion of revenue, does not support an inference of knowledge or recklessness. *Rahman*, 736 F.3d at 247. Plaintiffs do not even allege what Defendants knew, and courts routinely reject core operations arguments with far more details. *See, e.g.*, *id.*; *Dang*, 750 F. Supp. 3d at 477; *Stichting*, 775 F. Supp. 3d at 850.

### 4.      The competing, non-fraudulent inference is far more compelling.

A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Here, the non-fraudulent inference is far more cogent and compelling: Crocs acquired a new brand, ¶16, saw evidence of strong consumer demand, ¶21, and pursued a rational strategy to expand wholesale sales to meet that demand, ¶¶29–33. As time passed and more data became available, Crocs recognized this strategy did not work and initiated efforts to "clean-up" wholesale inventory, ¶85. Plaintiffs allege that Defendants intentionally "stuffed" wholesale channels in 2022, knowing it would negatively impact

HEYDUDE revenue in later years, without any motive or illicit profit. That is illogical. "[F]raud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later … discloses that things are less than rosy." *Cal. Pub. Emps.'*, 394 F.3d at 158 (cleaned up).

### C.    The Complaint Fails to Plead Loss Causation.

To plead loss causation, Plaintiffs must allege a truth was "reveal[ed]" that caused their economic loss. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007); *SLF Holdings*, 499 F. Supp. 3d at 70–71 ("corrective disclosure obviously must disclose new information"). Plaintiffs allege the "truth" here was gradually revealed, starting on April 27, 2023, when Crocs discussed the impact of wholesale "pipeline fill" on HEYDUDE in 2023. ¶¶4, 60–63; *see also* ¶¶71, 79, 84, 90, 102, 109, 119 (discussing stock reaction to "disclosures"). But this "corrective" information was not "new"—investors were told about wholesale expansion, "pipeline fill," and inventory clean-up. *See, e.g.*, ¶¶29, 32, 55, 61, 66, 67, 75–77, 91–92, 97. Any subsequent updates disclosed developing market conditions and strategy shifts, not an earlier fraud. Because the Complaint fails to allege the disclosure of "new" information, it fails to adequately allege loss causation. *See, e.g., SLF Holdings*, 499 F. Supp. 3d at 70 (corrective disclosures "did not reveal any new facts," warranting dismissal).

## II.    Plaintiffs Fail to State a Claim Under Section 20(a)

Section 20(a) of the Exchange Act imposes control-person liability only "where there is a predicate section 10(b) violation." *Handal*, 157 F.4th at 305 (internal citations omitted). Plaintiffs have not alleged a Section 10(b) violation, so their Section 20(a) claims cannot proceed. *Id.*

### CONCLUSION

Despite having an extended period to amend the original complaint, Plaintiffs failed to make meaningful amendments, much less meet the heightened PSLRA standards. The Complaint should be dismissed in its entirety and with prejudice.

**MORRIS, NICHOLS, ARSHT
& TUNNELL LLP**

OF COUNSEL:

/s/  D. McKinley Measley

D. McKinley Measley (#5108)
Elizabeth A. Mullin Stoffer (#6380)
Jacob M. Perrone (#7250)
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
(302) 658-9200
dmeasley@morrisnichols.com
emullin@morrisnichols.com
jperrone@morrisnichols.com

Monica K. Loseman*
Allison Kostecka*
Holly Rooke*
**GIBSON, DUNN & CRUTCHER LLP**
1900 Lawrence Street, Suite 3000
Denver, CO 80202
Telephone: (303) 298-5700
Fax: (303) 313-2829
Email: mloseman@gibsondunn.com
Email: akostecka@gibsondunn.com
Email: hrooke@gibsondunn.com

*Attorneys for Defendants*

Brian M. Lutz*
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200
Fax: (415) 393-8306
Email: blutz@gibsondunn.com

*Admitted Pro Hac Vice*

Dated: February 27, 2026

21