UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL ANTHONY CARRETTA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CROCS, INC., et al., <br><br> Defendants. | Civil Action No. 1:25-cv-00096-JLH-EGT <br><br> <u>CLASS ACTION</u> |

LEAD PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

ROBBINS GELLER RUDMAN
  & DOWD LLP
Christopher H. Lyons (#5493)
Jason M. Avellino (#5821)
1521 Concord Pike, Suite 301
Wilmington, DE  19803
Telephone:  302/467-2660

ROBBINS GELLER RUDMAN
  & DOWD LLP
Christopher M. Wood
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203

**APRIL 28, 2026**

4902-1551-8374.v2

**TABLE OF CONTENTS**

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.   SUMMARY OF ARGUMENT ......................................................................................1

III.  STATEMENT OF FACTS ...........................................................................................2

IV.   LEGAL STANDARD....................................................................................................4

V.    ARGUMENT...................................................................................................................4

    A.    The Complaint's Scheme Claims Are Undisputed ......................................4

    B.    The Complaint Pleads Material Misrepresentations and Omissions .......................5

        1.    Defendants Repeatedly Chose to Tout HEYDUDE's Purported Successes While Failing to Disclose Channel Stuffing .............................5

        2.    The Complaint's Allegations Are Particularized.......................................8

        3.    Defendants' Statements Were False When Made.......................................9

        4.    Defendants' Statements Were Not Forward-Looking, or Fall Outside the Safe Harbor.................................................................10

        5.    The So-Called "Opinion" Statements Are Actionable..............................11

        6.    Defendants' Misrepresentations Are Not Puffery.....................................12

    C.    The Complaint Alleges a Strong Inference of Scienter .......................................14

        1.    Defendants' "Very Conscious Decision" to Channel-Stuff and Failure to Disclose It Show Scienter.........................................................14

        2.    Defendants' Monitoring of HEYDUDE Inventory Supports Scienter, Consistent with the Core Operations Inference .........................16

        3.    Defendants Were Motivated to Conceal Their Channel-Stuffing..............18

        4.    Defendants' Proposed Non-Fraudulent Inference Fails............................18

    D.    The Complaint Sufficiently Pleads Loss Causation..............................................19

    E.    The Complaint Properly Pleads Control Person Liability ....................................20

VI.   CONCLUSION.................................................................................................................20

- i -

4902-1551-8374.v2

## TABLE OF AUTHORITIES

**Page**

### CASES

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)...................................................................7

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ...............................................................................9

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
   2024 WL 3219616 (D.N.J. June 28, 2024)..........................................................17

*Cunha v. Hansen Nat'l Corp.*,
   2012 WL 12886194 (C.D. Cal. Oct. 22, 2012).....................................................7

*Dang v. Amarin Corp.*
   750 F. Supp. 3d 431 (D.N.J. 2024) ...............................................................16, 18

*EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 (3d Cir. 2000)................................................................................5

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) .................................................................14

*Gambrill v. CS Disco, Inc.*,
   2025 WL 388828 (W.D. Tex. Jan. 30, 2025) ........................................................9

*GSC Partners CDO Fund v. Wash.*,
   368 F.3d 228 (3d Cir. 2004).............................................................................18

*Handal v. Innovative Indus. Props., Inc.*,
   157 F.4th 279 (3d Cir. 2025) ............................................................................16

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
   903 F.2d 186 (3d Cir. 1990).............................................................................12

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ...............................................16, 17, 18, 19

*In re Cerevel Therapeutics Holdings, Inc. Sec. Litig.*,
   2026 WL 867614 (D. Del. Mar. 30, 2026) ....................................................18, 19

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2020 WL 3026564 (D.N.J. June 5, 2020)..............................................................5

4902-1551-8374.v2

**Page**

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)....................................................9

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...................................................7, 14

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..........................................9

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)..............................................................16

*In re Humana Inc. Sec. Litig.*,
2026 WL 1134056 (D. Del. Apr. 27, 2026).........................................17, 20

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002) ...................................10, 13, 16, 18

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
543 F.3d 150 (3d Cir. 2008) *cert. granted sub nom.*,
*Merck & Co., Inc. v. Reynolds*, 556 U.S. 1257 (2009), *aff'd*,
559 U.S. 633 (2010).......................................................................11

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) .............................................19

*In re Plug Power Inc.*,
2025 WL 388705 (D. Del. Feb. 4, 2025)...........................................8, 20

*In re Plug Power Inc. Sec. Litig.*,
2026 WL 1067807 (D. Del. Apr. 20, 2026)....................................8, 10, 18

*In re Plug Power Inc. Sec. Litig.*,
No. 1:23-cv-409-JLH (D. Del.)............................................................8

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
311 F.3d 198 (3d Cir. 2002)..........................................................4, 8, 9

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd sub nom.*
*Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) .......................7

*In re Under Armour Sec. Litig.*,
2020 WL 363411 (D. Md. Jan. 22, 2020)............................................16

4902-1551-8374.v2

**Page**

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018) ...................................................................................13

*In re Urb. Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ........................................................................8, 13, 17

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014) ....................................................................................19

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) .....................................................................5

*Institutional Invs' Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ...........................................................................5, 8, 14, 18

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2016 WL 3981236 (D.S.C. July 25, 2016) .....................................................................13, 14

*Kurtzman v. Compaq Comput. Corp.*,
    2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ...................................................................13

*Lefkoe v. Jos. A. Bank Clothiers*,
    2007 WL 6890353 (D. Md. Sep. 10, 2007) .........................................................................13

*Levon v. CorMedix Inc.*,
    797 F. Supp. 3d 381 (D.N.J. 2025) .................................................................................16, 19

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ................................................................................................................4

*Makor Issues & Rgts, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) *cert. granted* 549 U.S. 1005 ..............................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................................................4

*Miller v. Burt*,
    765 F. App'x 834 (3d Cir. 2019) ..........................................................................................5

*Novak v. Kasaks*,
    216 F.3d 300 (2nd Cir. 2000) ..............................................................................................13

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) .....................................................................................7

4902-1551-8374.v2

**Page**

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................11

*Ortiz v. Canopy Growth Corp.*,
    537 F. Supp. 3d 621 (D.N.J. 2021) ........................................................................12

*Pelletier v. Endo Int'l PLC*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) .....................................................................17

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)...........................................................7

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)...................................................................................18

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)..............................................................14

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)...................................................................................10

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1927)...................................................................................12

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020), *aff'd*,
    2022 WL 3442353 (3d Cir. Aug. 17, 2022).........................................................20

*Techniek v. Verizon Commc'ns, Inc.*,
    775 F. Supp. 3d 826 (D.N.J. 2025) ........................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................4, 14, 15, 19

*Trustcash Holdings, Inc. v. Moss*,
    668 F. Supp. 2d 650 (D.N.J. 2009) .........................................................................4

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016).................................................................................................5

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).....................................................................................6

- v -

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b)................................................................................................................4, 5
    §78t(a)................................................................................................................20

Federal Rules of Civil Procedure
    Rule 9(b) ..............................................................................................................8
    Rule 12(b)(6)........................................................................................................4

Local Rules
    Rule 7.1.3(c)........................................................................................................5

17 C.F.R.
    §240.10b-5(a)..............................................................................................1, 4, 5
    §240.10b-5(b)......................................................................................................4
    §240.10b-5 (c)............................................................................................1, 4, 5

4902-1551-8374.v2

## I.    NATURE AND STAGE OF PROCEEDINGS

Lead Plaintiffs filed the Amended Complaint for Violations of the Federal Securities Law ("Complaint"), which is their first pleading in this action, on December 15, 2025.  D.I. 41.  Defendants moved to dismiss on February 27, 2026.  D.I. 47.  Plaintiffs oppose the motion.

## II.    SUMMARY OF ARGUMENT

As securities fraud cases go, this one is simple.  Plaintiffs allege Defendants knowingly created the appearance of explosive growth in the HEYDUDE brand through a deliberate channel-stuffing strategy—flooding wholesale channels with inventory far in excess of consumer demand—while assuring investors that growth was driven by strong demand, disciplined distribution, and appropriate inventory levels.  Then, as their scheme inevitably led to later-period revenue declines, Defendants admitted they had made a conscious decision to sell excessive product to wholesale customers, and that it had not been disclosed to investors at the time.  Crocs' stock price cratered, causing substantial investor losses.  In short, this is not a case of "fraud by hindsight;" it's just fraud.

1.    The Complaint plainly states a claim under SEC Rule 10b-5(a) and (c) that Defendants engaged in a deceptive scheme.  Defendants do not address or dispute scheme liability.[1]

2.    The Complaint pleads material misrepresentations and omissions.  Having chosen to tout HEYDUDE's growth, demand, and inventory, Defendants were obliged to tell the whole truth.  By instead concealing that HEYDUDE's initially fast growth was the result of selling wholesale customers more inventory than they needed—and, indeed, specifically denying that they were "overstock[ing]" wholesale customers—Defendants materially misled investors.

3.    The Complaint is sufficiently particularized.  It identifies the challenged statements, when and by whom they were made, and why they were misleading.

4.    Plaintiffs challenge present-tense statements about then-extant demand, inventory

---

[1]    D.I. 47, ("MTD").  Emphasis is added and citations are omitted unless otherwise indicated.

- 1 -

4902-1551-8374.v2

conditions, and sales dynamics, all of which fall outside the Private Securities Litigation Reform Act of 1995 ("PSLRA") safe harbor. The safe harbor also does not apply because Defendants spoke with actual knowledge that their statements were misleading. Generic risk warnings of potential future inventory issues cannot inoculate Defendants for concealing issues that were already occurring.

5.      Defendants' statements were not opinion statements, but even if they were, they are actionable. Statements about not "forcing inventory" onto wholesale customers causing them to become "overstocked," or that "sell-through" was strong, are concrete, objectively verifiable, present-tense assertions, not opinions or puffery. Even if they were opinions, they would still be actionable because they lacked a reasonable basis and omitted material facts.

6.      Plaintiffs allege a strong inference of scienter. Defendants admitted knowingly stuffing Crocs' wholesale channel with excess HEYDUDE inventory and failing to adequately disclose this fact to investors. Defendants closely monitored wholesale customers' HEYDUDE inventory and sales, including through weekly tracking reports. And Defendants were motivated to conceal their conduct, which inflated their own performance-based compensation.

7.      Plaintiffs adequately plead loss causation. The Complaint alleges a series of corrective disclosures gradually revealing the truth about HEYDUDE's inventory problems and the unsustainable nature of its prior growth, including disclosures revealing the impact of channel stuffing and, ultimately, Defendants' admission that the Company had shipped too much product into the market. These disclosures were followed by significant stock price declines, plausibly linking the revelation of the concealed facts to Plaintiffs' losses.

### III.    STATEMENT OF FACTS

After acquiring HEYDUDE, Defendants "immediately began touting the brand's explosive growth potential" and represented that its performance reflected strong consumer demand and a "disciplined" growth strategy. ¶¶17-22, 29, 31, 33, 40-41, 52, 55, 99. On August 4, 2022,

- 2 -

4902-1551-8374.v2

Defendants told investors that HEYDUDE was "one of the hottest brands in the U.S. footwear market today because of the consumer love of the brand and its products" and that Crocs' strategy would "result in robust U.S. growth from expanding wholesale distribution." ¶¶21, 29.

These representations omitted the central truth: a "big part of" HEYDUDE's reported growth was the result of "shipments to wholesale customers in amounts far in excess of consumer demand." ¶¶3, 28, 34, 39, 42, 44, 46, 50, 54, 59, 66, 120. Defendants knowingly engaged in this channel stuffing as "a conscious decision" to secure shelf space and compete with knockoffs. ¶¶3, 28, 34, 42, 44, 54, 59, 68, 73, 120. This strategy artificially inflated 2022 revenue while creating "bloated inventories at Crocs' wholesale customers," which "led to reduced sales to wholesale customers and lower revenue growth for Crocs in 2023 and 2024." ¶¶3, 28, 34, 39, 42, 44, 50, 54, 59, 69, 75-77, 85-87, 115-116, 118, 121.

Throughout the Class Period, Defendants repeatedly assured investors that demand was strong and inventory was under control. Defendants stated on August 4, 2022 that "consumer demand for both our brands is exceptional," and that they would "continue to … keep inventories lean." ¶¶24, 30. On November 3, 2022, Defendants said they were "not going to play the game of forcing inventory into [wholesale customers] and getting them overstocked." ¶41. They further touted "strong sell-throughs" and described their wholesale approach as "really disciplined." ¶¶21, 29, 41.

In fact, Defendants were "deliberately shipping excess product to Crocs' wholesale customers in amounts far greater than consumer demand." ¶¶28, 34, 39, 42, 44, 46, 50, 54, 59, 68. Defendants had real-time data on this mismatch, including "weekly tracking information on sellouts and inventory," yet concealed that the touted growth was unsustainable. ¶¶28, 34, 39, 42, 54, 121.

When the truth began to emerge, Defendants acknowledged, "we had significant pipeline

- 3 -

fills," the strategy "was a very conscious decision," and "we probably could have done a better job being a little clear about that." ¶¶61, 68, 69, 75-77, 120.  Analysts concluded that 2022 "growth was somewhat overstated, partly driven by wholesale pipeline fill." ¶62.  Even in October 2024, analysts remained unclear, asking "how overstated were the sales last year? … And how much of just filling shelf space and things you did back then caused what happened now?" ¶117.

## IV.    LEGAL STANDARD

On a Rule 12(b)(6) motion, courts must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  Courts must "draw all reasonable inferences in favor of the [plaintiff]." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002).

To state a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  To state a claim under SEC Rule 10b-5(a) and (c), "a plaintiff must allege that [the] defendant (1) committed a manipulative or deceptive act[,] (2) in furtherance of [an] alleged scheme to defraud, (3) scienter, (4) and reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661 (D.N.J. 2009); 17 C.F.R. §240.10b-5(a), (c).

## V.    ARGUMENT

### A.    The Complaint's Scheme Claims Are Undisputed

The Exchange Act's scheme liability "provisions capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019).  Scheme liability claims have been upheld where "the Court can plausibly infer from the alleged facts that [defendant] engaged in a pattern of deceptive conduct …."

- 4 -

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at \*18 (D.N.J. June 5, 2020).

Defendants do not address, and therefore concede, that Plaintiffs plead a fraudulent scheme under SEC Rule 10b-5(a) and (c).  ¶¶142-143; *see also*, *e.g.*, ¶5.  Regardless, the Complaint satisfies the standard.  Defendants' scheme involved: (i) flooding wholesale channels with excess inventory far exceeding demand to inflate reported revenues; (ii) concealing that conduct and its foreseeable consequences—namely, that wholesale partners were accumulating excess inventory that would depress future sales; and (iii) falsely assuring investors that demand was strong, inventory was well managed, and growth was sustainable.  ¶¶3, 28, 34, 66-69.

Defendants may not address the scheme claim on reply.  L.R. 7.1.3(c); *Miller v. Burt*, 765 F. App'x 834, 838 (3d Cir. 2019); *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at \*4 (M.D. Tenn. Apr. 8, 2021).  Thus, the Complaint can and should be upheld.

## B.  The Complaint Pleads Material Misrepresentations and Omissions

To plead falsity under Section 10(b), Plaintiffs must allege facts supporting a reasonable belief that Defendants made statements that were false or misleading because they omitted material facts necessary to make those statements not misleading.  *Institutional Invs' Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  A misrepresentation or omission "'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"  *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000).

### 1.  Defendants Repeatedly Chose to Tout HEYDUDE's Purported Successes While Failing to Disclose Channel Stuffing

"[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations."  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016).  "Once a company has chosen to speak on an issue … it cannot omit material facts related to that issue so as to make its disclosure misleading."

- 5 -

*Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017).

Here, Defendants chose to speak about HEYDUDE's growth, demand, and inventory, specifically attributing its growth to strong consumer demand and disciplined distribution, while concealing that it was driven by a deliberate "pipeline fill" scheme—*i.e.*, channel stuffing.

At the start of the Class Period, Defendants claimed that Crocs would use a "disciplined go-to-market and distribution strategy" that would produce "robust U.S. growth." ¶¶21, 29. Defendants assured investors that consumer demand was "exceptional" and that they would "keep inventories lean." ¶¶24, 30. In November 2022, Defendants ***denied*** channel stuffing, stating they were "not going to play the game of forcing inventory into [wholesale partners] and getting them overstocked," and assured investors they were seeing "strong sell-throughs." ¶41.

These statements were materially false and misleading. HEYDUDE's revenue growth in 2022 resulted from Defendants' scheme and "consisted largely of shipments to wholesale customers in amounts far in excess of consumer demand," which Defendants later called "pipeline filling" and is "commonly known as 'channel stuffing.'" ¶3.

Defendants' statements were not just materially incomplete—they affirmatively misrepresented the fundamental driver of HEYDUDE's growth. *Compare* ¶41, *with* ¶¶42, 68, 117. Rather than reflecting genuine demand, the reported revenue figures were "attributable to this strategy" of excess shipments, which created "bloated inventories at Crocs' wholesale customers" and "led[] to reduced sales to wholesale customers and lower revenue growth" in subsequent periods. ¶¶3, 28, 117. By attributing growth to "consumer demand" while concealing that it was actually driven by channel stuffing, Defendants presented a classic half-truth. *Williams*, 869 F.3d at 241.

4902-1551-8374.v2

These misrepresentations continued throughout the Class Period. Even as the truth started to trickle out in April 2023, Defendants reassured investors that the Company was "well positioned in market with good inventories" and that "inventory turning [was] performing well." ¶64. They maintained that wholesale partners were seeing "strong sell-throughs" and that the Company was being "really disciplined" with managing inventory. ¶¶41, 64. These statements were misleading because Defendants knew wholesale customers were saddled with excess inventory and would necessarily reduce future purchases while working through that inventory. ¶¶28, 42, 117.

Courts routinely find similar misstatements actionable. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416 (S.D.N.Y. 2020) (upholding allegations "that Evoqua engaged in improper 'channel stuffing' practices, 'which had the effect of concealing the extent to which Evoqua was struggling to grow organically'").[2]

The Complaint sets forth each misrepresentation and omission, who made them, the date of each statement, and why such statements were false and misleading. *Compare* ¶¶24-27, 35-38, 43, 47-49, 51-53, 85, 95, 103-105 (touting growth); ¶¶29-33 ("disciplined" distribution and "exceptional" sell-through; plan to "keep inventories lean"; and growth not related to "filling that pipeline"); ¶¶40-41 ("we really have minimal shelf presence" and "we're not going to play the game

---

[2]    *See also In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ("Plaintiffs allege that the Company misrepresented its financial condition by failing to disclose its channel stuffing activity. Such allegations are sufficient to state a claim."); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (attributing growth to increased demand was misleading when "end-user demand was inadequate"); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) (defendants failed to disclose "sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of inventory"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (reasonable investor would find material that revenues were driven by inflated channel inventory); *Cunha v. Hansen Nat'l Corp.*, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (defendants misled investors by "push[ing] an excessive quantity of [its product] to distributors in order to make investors think there was a sustainably higher demand for [its] products").

4902-1551-8374.v2

of forcing inventory into [wholesale customers] and getting them overstocked"); ¶¶45, 55-58 (saying customer demand exceeded distribution and channel inventory was appropriate); ¶64 ("well positioned in market with good inventories" and "inventory turning [was] performing well"); ¶¶72, 80, 99 (touting strong sell-through); ¶¶97, 103-105, 110-111 (reassuring cleanup was progressing well), *with* ¶¶28, 34, 39, 42, 44, 46, 50, 54, 59, 61-62, 66-69, 75-77, 81, 85-87 (alleging failure to disclose channel-stuffing as basis for growth); ¶¶98, 100, 106, 113, 116 (alleging failure to disclose true status of cleanup).  No more is required.  *Avaya*, 564 F.3d at 253; *Rockefeller*, 311 F.3d at 217.

## 2.    The Complaint's Allegations Are Particularized

Defendants wrongly claim the Complaint makes "no effort to pinpoint what is false or misleading."  MTD at 8-9.  But the Complaint does not require the Court to piece together a theory of fraud; rather, it presents a coherent, unified narrative explaining how Defendants' Class Period statements were misleading.  Properly read, the Complaint amply satisfies Rule 9(b) and the PSLRA by clearly tying Defendants' statements to the concealed facts that made them misleading.[3]

Far from supporting Defendants, this Court's opinions in *In re Plug Power Inc. Sec. Litig.*, No. 1:23-cv-409-JLH (D. Del.) demonstrate the Complaint's adequacy.  While holding that it was "not the Court's job to parse through 33 pages of alleged false statements [in a] 111-page Complaint," *In re Plug Power Inc.*, 2025 WL 388705, at *2 (D. Del. Feb. 4, 2025) ("*Plug Power I*"), the Court granted leave to amend and then ***upheld*** in part the next complaint.  *In re Plug Power Inc. Sec. Litig.*, 2026 WL 1067807 (D. Del. Apr. 20, 2026) ("*Plug Power II*").  In contrast, the 47-page Complaint here is far more streamlined and straightforward than the pleading partly upheld in *Plug Power II*.

---

[3]    *See In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 646, 648 (E.D. Pa. 2015) (holding "a Complaint which alleges the defendant CEO in a securities fraud case misrepresented to investors that the demand for his company's products was 'solid,' 'strong,' and 'good' when the actual condition of sales was 'disappointing' and had 'declined,' is sufficiently particularized").

4902-1551-8374.v2

### 3.    Defendants' Statements Were False When Made

Misleading statements about the source of a company's revenues and the "drivers of [its] success" are actionable. *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *12 (M.D. Tenn. Nov. 19, 2019) ("statements regarding the drivers of success [can be] misleading for omitting information regarding [improper billing practices] as a factor driving revenue"); *Gambrill v. CS Disco, Inc.*, 2025 WL 388828, at *8 (W.D. Tex. Jan. 30, 2025) (same). Defendants' contention that "Plaintiffs cannot frame accurate reporting as misleading" fails. *See* MTD at n.5.

Nor is this "fraud by hindsight" (*see id.* at 10), as "later developments may allow a reasonable inference that prior statements were untrue or misleading when made." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023). The Complaint does not allege Defendants "in retrospect, shipped too much inventory." MTD at 10. Defendants admitted that channel stuffing was a "conscious decision," ***not*** disclosed to investors. ¶¶68, 69.

This is confirmed by securities analysts—whose livelihoods depended on a thorough understanding of the Company's business practices—one of whom incredulously asked Rees in ***October 2024, "how overstated were the sales last year?"***—a question that would be inexplicable had Defendants actually informed investors of their scheme before that time. ¶117.[4]

Defendants' counter-narrative ignores the allegations, admissions, and market reactions. Their "preferred narrative" cannot be credited on this motion, *see In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017), where the Court must "draw all reasonable inferences in favor of the plaintiff." *Rockefeller*, 311 F.3d at 215.

---

[4]    After Defendants announced lackluster 3Q23 earnings, one analyst wrote on November 2, 2023, that Defendants had lost investors' trust. ¶89. Another questioned Defendants' purported explanation for FY24 weakness, writing "[g]iven the magnitude of the HEYDUDE revision, ***it's hard to believe*** that this is mostly due to a shift in marketing." ¶118.

- 9 -

4902-1551-8374.v2

**4.    Defendants' Statements Were Not Forward-Looking, or Fall Outside the Safe Harbor**

Defendants wrongly contend that many of the alleged misstatements are forward-looking and non-actionable. *See* MTD at 12-14. In fact, many of the statements in their string cite are not forward-looking in the first place.[5] Nor would they be subject to dismissal in any case.

"The question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on this motion to dismiss." *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002). Warning that a company may not be able to "'execute our long-term growth strategy [or] maintain or grow our current revenue and profit levels'" (*see* MTD at 13) is classic boilerplate, routinely rejected as meaningless. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).

Defendants' cautionary language was not "substantive and tailored to the specific future projections, estimates or opinions … which the plaintiffs challenge.'" *Id.* This is not a case where Defendants failed to "accurately forecast consumer demand." *See* MTD at 13. Rather, Defendants made a "'conscious' decision to overstock the wholesale channels," yet concealed such practices, and their effects, until the end of the Class Period. ¶¶68-69, 114-117.

In any case, forward-looking statements are actionable when cautionary language warns as hypothetical of risks which have already come to pass. *Plug Power II*, 2026 WL 1067807, at *3. Warning that Crocs may not be able to "maintain or grow our current revenue and profit levels," (MTD at 13) when Defendants had actual knowledge that Crocs' revenue growth was unsustainable, renders such warnings meaningless, and any adjacent forward-looking statements are actionable.

---

[5]    *E.g.*, ¶24 ("HEYDUDE ***continues*** to outperform … consumer demand for both our brands ***is*** exceptional"); ¶27 ("HEYDUDE revenues ***continue to*** exceed our expectations"); ¶29 ("Our strategy ***utilizes*** … a disciplined go-to market and distribution strategy."); ¶¶30, 32, 33, 37, 38, 40, 41, 47, 49, 52, 53, 55, 64, 66, 75, 76, 77, 85, 91, 92, 95, 97, 103, 104, 107.

4902-1551-8374.v2

### 5.   The So-Called "Opinion" Statements Are Actionable

"[M]agic words" such as "we believe" do not transform factual assertions into protected opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 192-93 (2015).  Statements framed as opinions are actionable where they contain embedded factual assertions, lack a reasonable basis, or omit material facts necessary to make them not misleading. *See In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) *cert. granted sub nom.*, *Merck & Co., Inc. v. Reynolds*, 556 U.S. 1257 (2009), *aff'd*, 559 U.S. 633 (2010).

First, many of the challenged statements are not opinions at all.  Defendants repeatedly represented that HEYDUDE demand was "exceptional," that wholesale "sell-through" was strong, and that they were not "forcing inventory" into wholesale partners or allowing them to become "overstocked." ¶¶31, 34, 41.  These are concrete, present-tense assertions about demand, inventory levels, and sales—objectively verifiable matters, not matters of subjective belief.  Such statements cannot be recast as opinions just by added prefatory language.[6] *Omnicare*, 575 U.S. at 185, 192-93.

Second, even if certain statements could be construed as opinions, they are actionable because they lacked a reasonable basis and omitted material facts.  At the time Defendants made these statements, they were deliberately "deliver[ing] excess merchandise into [their] wholesale channels in amounts far exceeding consumer demand," inflating reported revenues through channel stuffing.  ¶28.  Defendants also had access to contemporaneous information regarding wholesale inventory levels and sell-through trends. ¶121.  In light of these facts, Defendants' statements about strong demand, healthy inventory, and disciplined distribution lacked any reasonable basis.

Third, Defendants' statements are actionable because they omitted critical facts necessary to

---

[6]   Other statements also include statements of facts and cannot be characterized as mere opinions. ¶¶27, 29, 32, 37-38, 40-41, 43, 47, 52-53, 55, 61, 66, 68-69, 72, 76-77, 80, 85, 87, 91, 99, 104-105, and 111.

make them not misleading.  *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 672 (D.N.J. 2021) (undisclosed adverse facts made opinion actionable).  No reasonable investor would interpret Defendants' assurances regarding demand, inventory, and growth as consistent with a strategy of flooding the market with excess product that wholesale customers could not sell.  By omitting these facts, Defendants' statements conveyed a materially misleading picture of HEYDUDE's performance and prospects.  *Supra* at §§III, V.B.1.  Again, Defendants' own admissions—together with the market's reaction—confirm the misleading nature of their prior statements; Defendants later admitted pipeline fill was a "conscious decision," that they "didn't do a good enough job explaining" it, and that they had "ship[ped] too much product."  ¶¶68, 69, 117.  Analysts understood these disclosures as revealing that prior growth had been artificially inflated.  ¶¶62, 117.  This contemporaneous market reaction is powerful evidence that investors were misled by Defendants' earlier statements attributing growth to consumer demand and disciplined execution.  The challenged statements—whether framed as opinions or otherwise—were materially misleading when made.

### 6.    Defendants' Misrepresentations Are Not Puffery

None of the alleged misstatements constitute puffery.[7]  *See* MTD at 15-16.  As a threshold matter, "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1927).  "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Id.*

In any case, "statements regarding inventory, such as 'retail is pretty good and inventories are

---

[7]    "To say that a statement is mere 'puffing' is, in essence, to say that it is immaterial …."  *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200 (3d Cir. 1990).

clean,'" are actionable where a complaint alleges they were "inconsistent with the underlying data in … Defendants' possession." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 685 (D. Md. 2018); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2nd Cir. 2000) (statements like "the inventory situation was 'in good shape' or 'under control'" not puffery); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5-*6 (D.S.C. July 25, 2016) (statements that inventory backlog was "healthy" were actionable for "failure to inform fully investors of [the company's] inventory-related difficulties"). Here, many of the statements Defendants challenge as puffery represented that "consumer demand for both our brands is exceptional," that wholesale partners were experiencing "strong sell-throughs," that the Company would "keep inventories lean," and that it was "not going to play the game of forcing inventory into [wholesale customers] and getting them overstocked," (¶¶21, 24, 30, 41) each of which conveyed concrete, present-tense facts about demand, inventory levels, and sales performance. These statements are clearly not puffery. *See, e.g.*, *Urban Outfitters*, 103 F. Supp. 3d at 648 (representation that demand was "solid," "strong," and "good" actionable when "the actual condition of sales was 'disappointing' and had 'declined'"); *Lucent*, 217 F. Supp. 2d at 558 (statement that demand for products was "robust" not puffery); *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 (D. Md. Sep. 10, 2007) (statements concerning "confidence in inventory" and "specific failures to disclose the excessive inventory build-up and the resultant need to engage in steep discounting" were material); *Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632, at *37 (S.D. Tex. Dec. 12, 2000) (inventory was in "'good shape'" was a "specific, definite" statement).

The materiality of Defendants' misrepresentations is further demonstrated by the fact that many were in "direct response" to analysts' questions.[8] *Makor Issues & Rgts, Ltd. v. Tellabs, Inc.*,

---

[8] ¶¶31-32, 40-41, 43, 45, 55, 57, 58, 61, 64, 76-77, 91-22, 99, 117.

437 F.3d 588, 597-98 (7th Cir. 2006) *cert. granted* 549 U.S. 1005 (2007, *vacated in part on other grounds*, 551 U.S. 308 (2007).  In this context, a statement goes "well beyond puffery." *Id.*; *see also Dentsply*, 665 F. Supp. 3d at 284 (same).  The precipitous declines in Crocs' stock price as the truth was revealed (¶¶4-5, 63, 71, 79, 90, 102, 109, 140) further demonstrate the materiality of Defendants' misrepresentations.  *See Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014); *KBC Asset Mgmt.*, 2016 WL 3981236, at *6 (same).

### C.     The Complaint Alleges a Strong Inference of Scienter

"Scienter is a 'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252.  Adequately pleading scienter requires alleging facts supporting a "strong inference" of "either reckless or conscious behavior." *Id.* at 276.  A plaintiff may rely on "'facts that constitute circumstantial evidence of either recklessness or conscious behavior,'" by pleading that "'defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *15, *18 (D.N.J. July 27, 2018).

The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.  Scienter will "ultimately rest … on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.  The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  It needs only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

#### 1.     Defendants' "Very Conscious Decision" to Channel-Stuff and Failure to Disclose It Show Scienter

Defendants have effectively admitted scienter, conceding that their decision to push excess

- 14 -

HEYDUDE products onto wholesale customers was deliberate, that this practice enhanced HEYDUDE's short-term performance to the detriment of later performance, and that they did not disclose these facts.  ¶120.

On an April 27, 2023 earnings call, Rees partially admitted for the first time that HEYDUDE's 2022 revenues were inflated by "pipeline fill" and channel stuffing.  ¶¶60-61.  At least one analyst understood this to admit that Crocs' 2022 revenue "was somewhat overstated, partly driven by wholesale pipeline fill."  ¶62.  Rees claimed, however, that Crocs was "well positioned" as to wholesaler inventories and "inventory turning [was] performing well."  ¶64.

At a June 7, 2023 industry conference, Rees again admitted that a "big part" of Crocs' 2022 growth "was pipeline fill," and that "[i]t was a very conscious decision on our part to do that [pipeline filling] last year.…  So that was a conscious decision we made.  I think we probably could have done a better job being a little clear about that."  ¶¶66, 68.  Rees went on to explain that the "bumps" resulting from this pipeline fill were "intentional.  Apologies, we didn't do a good enough job explaining that."  ¶69.  On a July 27, 2023 earnings call, Rees reiterated that the pipeline fill was a "very conscious decision," but nonetheless attributed the Company's July 2023 lowering of HEYDUDE's revenue growth outlook to the impact of that decision.  ¶75.

On an October 29, 2024 earnings call, after Crocs revealed that HEYDUDE sales would "take longer than … initially planned … to turn the corner," an analyst asked "***how overstated were the sales last year?*** ….  And how much of just filling shelf space and things you did back then caused what happened now?"  ¶¶116-117.  Defendants did not deny that the pipeline-filling caused sales to be "overstated," instead conceding: "we absolutely ship[ped] too much product[].  So if you're asking what decisions we made that were wrong, that was wrong."  *Id.*

Unsurprisingly, "[c]ourts have consistently found scienter where defendants represent

- 15 -

knowledge about the misrepresented topics." *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 420-21 (D.N.J. 2025) (collecting cases). Courts have also consistently found scienter where defendants consciously engage in suspect practices like channel stuffing too. *E.g.*, *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *7 (D. Md. Jan. 22, 2020) ("pulling in sales from future quarters and shipping goods to retailers even when [company] knew the goods would likely never be sold to consumers" permitted "strong inference of scienter"); *Lucent*, 217 F. Supp. 2d at 538, 553-55 (plaintiffs "amply demonstrated scienter" where "Defendants were on notice" issuer was "'stuffing' its distributors with products they did not want, did not need, and had not ordered"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 596-98 (D.N.J. 2001) (scheme to get "customers to purchase more and more product, far more than those customers needed" while "fail[ing] to disclose any of this information to [company's] investors" supported "strong inference" of scienter").

Here, Defendants conceded "very conscious" knowledge of the challenged practices and that they were not adequately disclosed. This amply supports scienter. In none of the cases Defendants cite did any defendant explicitly state that the specific issue that was misrepresented or concealed was one of which they were "conscious" but failed to explain.[9]

### 2. Defendants' Monitoring of HEYDUDE Inventory Supports Scienter, Consistent with the Core Operations Inference

Further supporting scienter is Defendants' monitoring of wholesalers' HEYDUDE inventory levels. ¶121. Defendant Rees touted Crocs' "visibility and transparency" into wholesale customers' HEYDUDE inventory and sales, receiving "weekly tracking information on sellouts and inventory

---

[9]   *See Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 302-03 (3d Cir. 2025) (plaintiff claimed issuer was reckless in not knowing third-party "was swindling it" through reimbursements, having responded to unrelated report with "blanket statement about all [the issuer's] reimbursements"); *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) (admitting "'inappropriate tone at the top'" did not admit knowledge of fraud); *Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 476 (D.N.J. 2024) (plaintiffs relied on "general," "broad statements" about patent litigation in general, not "specific considerations and granular details" of concealed study).

4902-1551-8374.v2

on hand and terms" from those customers. *Id.* Defendants had current information about the "key" wholesale customers' inventory and actual sales. *Compare id.*, *with*, *e.g.*, ¶30 (claiming company kept "inventories lean"); ¶31 (denying growth related to "filling that pipeline"; "sell-through is exceptional"); ¶33 (claiming inventory "turns very quickly"); ¶41 (denying customers were "overstocked"). Yet, Defendants concealed that a "big part" of 2022 revenue came from selling excess inventory to wholesale customers that they knew could not be sold through promptly, inevitably leading to lower future sales to those customers. ¶¶61, 66, 68, 117.

Defendants note the absence of "contemporaneous witness accounts or internal documents" (MTD at 16), but ignore that Plaintiffs did not need a whistleblower ***where Defendants themselves admit they received those reports***. *Compare* ¶121, *with*, *e.g.*, *In re Humana Inc. Sec. Litig.*, 2026 WL 1134056, at *3 n.3 (D. Del. Apr. 27, 2026) (allegation that company "actively tracked" utilization rates supported inference that CFO was aware of actual trend); *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 & n.8 (E.D. Pa. 2020) (scienter pled where witness claimed defendant "received regular reports" relevant to undisclosed scheme). Defendants' regular review of the relevant data "separate this case from others in which courts have found that scienter was inadequately pled." *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *14 (D.N.J. June 28, 2024).

Further, the statements at issue concerned Crocs' core operations: HEYDUDE accounted for a quarter of its revenue in 2022 and was one of just four reporting segments. ¶125. This further supports "an inference of scienter." *Urb. Outfitters*, 103 F. Supp. 3d at 653-54.

Defendants' cases are inapposite. In each, the plaintiff failed to allege what specific

information was reported to defendants.[10]  Here, the Complaint explains the weekly reports provided data on HEYDUDE inventory on hand and sell-through—the precise data showing how the channel-stuffing had left wholesale customers with much more inventory than they could sell in any reasonable time.  ¶121; *cf. Campbell*, 145 F. Supp. 2d at 597; *Lucent*, 217 F. Supp. 2d at 553-55.

### 3.    Defendants Were Motivated to Conceal Their Channel-Stuffing

While motive allegations are not necessary,[11] the Complaint includes them.  In 2022, most of Rees and Mehlman's compensation (89% and 66%, respectively) depended on HEYDUDE revenue.  ¶123.  By overloading wholesalers, the Company achieved record revenue in 2022, $895.9 million of which came from HEYDUDE—as highlighted in the Compensation Committee's annual assessment of executive compensation.  *Id.*  As a result, Rees and Mehlman's 2022 compensation was inflated, with Rees receiving $8.8 million, and Mehlman $1.2 million, of performance-based awards.  *Id.*

Even if these facts do not themselves create "a strong inference of scienter," they "provide some additional support for scienter."  *In re Cerevel Therapeutics Holdings, Inc. Sec. Litig.*, 2026 WL 867614, at *12 (D. Del. Mar. 30, 2026) (executive's compensation supported scienter).[12]

### 4.    Defendants' Proposed Non-Fraudulent Inference Fails

Defendants ask that, contrary to their prior confessions, the Court credit a new story: that Crocs' "pipeline fill" followed by reduced sales was just a strategy that "did not work."  MTD at 19-

---

[10]  *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245, 247 (3d Cir. 2013) (no specific allegation regarding information provided to management and underlying issues were too minor to affect the "core operations"); *Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*, 775 F. Supp. 3d 826, 850 (D.N.J. 2025) ("[P]laintiffs fail to allege that there was 'specific information conveyed to management and related to fraud.'"); *Dang*, 750 F. Supp. 3d at 477 (doctrine did not support scienter "regarding any statement made within a broad perimeter of the relevant core operations," absent allegations respecting specific concealed study).

[11]  *See, e.g.*, *Rahman*, 736 F.3d at 246; *accord Plug Power II*, 2026 WL 1067807, at *3-*4 (denying motion to dismiss and finding scienter adequately pled without addressing motive).

[12]  Defendants' cases only say that compensation based on an allegedly inflated metric, "**alone** cannot give rise to a 'strong inference' of fraudulent intent."  *GSC Partners CDO Fund v. Wash.*, 368 F.3d 228, 237-38 (3d Cir. 2004); *accord Avaya*, 564 F.3d at 278-79.

- 18 -

4902-1551-8374.v2

20. But Defendants represented that they were keeping inventory "lean" and not "overstock[ing]" wholesale customers, while they were consciously doing the opposite. *Compare* ¶¶30, 41, *with* ¶¶66-69, 117. Confirming knowledge that channel stuffing "would negatively impact HEYDUDE revenue in later years" (*see* MTD at 19-20), Defendants admitted to "a very conscious decision" to take an undisclosed approach that would not "smooth out the growth" but instead cause "bumps" in the wholesale business. *See* ¶¶68-69. In short, the inference that Defendants knowingly worked to increase short-term revenue to the detriment of future periods by causing wholesale "customers to purchase more and more product, far more than those customers needed," while "fail[ing] to disclose any of this information to [Crocs] investors," is far stronger than Defendants' non-fraudulent inference. *See Campbell*, 145 F. Supp. 2d at 596-98 (rejecting argument that defendants "lacked scienter because they thought that their growth plans would buoy sales"); *see also Tellabs*, 551 U.S. at 324 (scienter inference need only be "at least as compelling as any opposing inference").

### D.    The Complaint Sufficiently Pleads Loss Causation

"Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014). "'[L]oss causation is adequately pled when a company's stock price declines after media reports and disclosures presented new information about the alleged fraud to the public,'" (*Levon*, 797 F. Supp. 3d at 429-30), which can be through "a series of partial corrective disclosures." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011). "[L]oss causation is governed by [Rule] 8(a)." *Cerevel*, 2026 WL 867614, at *12.

Each time Defendants revealed more information about the extent and impact of their channel stuffing, Crocs' stock price dropped significantly. ¶¶71 (4% drop), 79 (15% drop), 84 (4% drop), 90 (5% drop), 102 (2.2% drop), 109 (2.65% drop), 119 (19% drop). The Complaint explains "Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Lead

- 19 -

Plaintiffs and the Class," as the stock price "significantly declined when the misrepresentations made to the market, the information alleged in this Complaint to have been concealed from the market, and the effects of that information were revealed." ¶140. This is sufficient. As this Court recently held, "[s]o long as the disclosure provides new information to the market, 'the concealment of which caused inflation of stock price at the time of buyer's purchase,' it provides a basis for loss causation if the stock price falls upon said disclosure." *Humana*, 2026 WL 1134056, at *4.

Defendants' only response is that "the Complaint fails to allege the disclosure of 'new' information." MTD at 20.[13] This is belied by Defendants' admissions that they "could have done a better job being a little clear about," and "didn't do a good enough job explaining," their "conscious decision" to overload wholesale customers. ¶¶68-69. It is also belied by analysts' reactions to the news that 2023 revenues would be down due to "channel fill." ¶¶70, 78, 88-89. Analysts continued digging for the truth until October 2024. ¶¶117-119. This suffices to "plausibly allege [the later statements] contained new information." *See Humana*, 2026 WL 1134056, at *4.

### E.    The Complaint Properly Pleads Control Person Liability

Defendants' only challenge to control person liability under §20(a) of the Exchange Act is that there is no primary violation. MTD at 20. This is incorrect, as explained above.

## VI.    CONCLUSION

The motion to dismiss should be denied. If it is granted, Plaintiffs request leave to amend.[14]

---

[13]    *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49 (D. Del. 2020), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022) is inapt. *See id.* at 64-67, 70-71 ("disclosures did not reveal any new facts").

[14]    *See Plug Power I*, 2025 WL 388705, at *2-*3 (dismissing with leave to replead; instructing parties to confer on "representative statements to be addressed in [a future] motion to dismiss").

- 20 -

4902-1551-8374.v2

DATED:  April 28, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP


*/s/ Christopher H. Lyons*

Christopher H. Lyons (#5493)
Jason M. Avellino (#5821)
1521 Concord Pike, Suite 301
Wilmington, DE  19803
Telephone:  302/467-2660
clyons@rgrdlaw.com
javellino@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Christopher M. Wood (admitted *pro hac vice*)
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
cwood@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

- 21 -

4902-1551-8374.v2